THE STATE, EX REL. DAYTON NEWSPAPERS, INC., D. B. A.
DAYTON DAILY NEWS ET AL., *v.* PHILLIPS, JUDGE,
MONTGOMERY COUNTY COURT OF COMMON PLEAS.

[Cite as State, ex rel. Dayton Newspapers, v. Phillips
(1976), 46 Ohio St. 2d 457.]

(No. 75-1036—Decided June 11, 1976.)

458

Messrs. Estabrook, Finn & McKee, Mr. Chester E. Finn, Mr. Robert P. Bartlett, Jr., Mr. Robert E. Portune and Mr. Thomas L. Czechowski, for relator.

Messrs. Jeffrey, Donnelly, Snell, Rogers & Greenberg and Mr. Harry P. Jeffrey, for respondent.

O'NEILL, C. J. The question to be determined by this court is: Shall a permanent writ be granted?

Two issues require resolution at the threshold in the determination of this cause. The first of these is whether an action in prohibition is the appropriate remedy for the relief sought.

On authority of State, ex rel. Beacon Journal Publishing Co., v. Kainrad (1976), 46 Ohio St. 2d 349, and State, ex rel. Northern Ohio Telephone Co., v. Winter (1970), 23 Ohio St. 2d 6, 260 N. E. 2d 827, prohibition lies.

The second threshold issue is whether relator has standing to maintain the action.

Standing of CBS, Inc., an owner and operator of a

television and radio network, to mandamus a district court judge to vacate an order directing "* * * all counsel and court personnel, all parties concerned with * * * [the] litigation * * * their relatives, close friends, and associates * * * to refrain from discussing in any manner whatsoever * * * [the pending cases] with members of the news media or the public," was raised in *CBS, Inc.,* v. *Young* (C. A. 6, 1975), 522 F. 2d 234.

Rejecting the argument that CBS lacked standing to apply for mandamus, the Circuit Court of Appeals reasoned as follows, at pages 237, 238:

"The doctrine of standing is well established and has been employed in many instances as a device to deny litigants access to the courts. The Supreme Court in *Data Processing Service* v. *Camp*, 397 U. S. 150, 90 S. Ct. 827, 25 L. Ed. 2d 184 (1970), enunciated the requirements for a party to have standing. The first requirement, as the Court stated, is that the plaintiff must allege that the challenged action has caused him injury in fact, economic or otherwise. That petitioner has satisfied this prong of the test is clear from the petition and from the face of the order itself, as already pointed out. The second requirement as set forth in *Data Processing* is that 'the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' This aspect of the *Data Processing* test is also satisfied here. This is true because the order of May 6, in denying to petitioner access to potential sources of information, at least arguably impairs rights guaranteed to the petitioner by the First Amendment. We are not persuaded by the argument that petitioner lacks standing because it is not a party to the civil litigation. The fact remains that its ability to gather the news concerning the trial is directly impaired or curtailed. The protected right to publish the news would be of little value in the absence of sources from which to obtain it. This was recognized by the Supreme Court in *Branzburg* v. *Hayes,* 408 U. S. 665, 681, 92 S. Ct. 2646, 2656,

33 L. Ed. 2d 626 (1972), where the court stated: 'Without some protection for seeking out the news, freedom of the press could be eviscerated.' News gathering thus qualifies for First Amendment protection. See *Branzburg* at 681 and 707, 92 S. Ct. 2646.

"Thus, though CBS was not named in the order, *cf. Times-Picayune Publishing Corp.* v. *Schulingkamp,* 419 U. S. 1301, 95 S. Ct. 1, 42 L. Ed. 2d 17 (1974), nevertheless, as applied to CBS, this order affected its constitutionally guaranteed right as a member of the press to gather news."

Adopting the foregoing reasoning and applying it to the instant cause, this court holds that relator has standing to maintain the present action.

This case deals with the right of a newspaper to observe and publish a report of what happens at a judicial proceeding in a criminal case.

A court order which denies that right has the force of law. There can be no dispute about the fact that such an order abridges the freedom of the press. Such abridgment is prohibited by the First Amendment to the Constitution of the United States and by Section 11 of Article I of the Ohio Constitution.

Can such a court order be constitutionally upheld on the ground that its issuance is required to assure the defendant, in the criminal proceedings, an impartial jury in his later trial on felony charges?[1]

The central and controlling issue in the instant case may be stated thus:

When the trial court, in a sensational kidnapping and murder case, has before it:

1. a motion for change of venue by a defendant,

2. motions to suppress evidence by the defendant,

---

[1]The Sixth Amendment to the Constitution of the United States reads:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed * * *."

3. a motion to close the courtroom, exclude the public and bar the press from observing and reporting and publishing anything which may transpire in a court-room hearing on the motions to suppress,

and is faced with the possibility that the publicity generated by a pretrial hearing on the motions to suppress may prejudice potential jurors and thus jeopardize the securing of an impartial jury in the defendant's trial to be held later, what action should the court take to guarantee the defendant an impartial jury and preserve unabridged the freedom of the press?

The answer is simple.

(1) The court should overrule the motion which requests the court to close the courtroom, exclude the public and bar the press during the hearing on the motions to suppress because the First Amendment to the Constitution of the United States and Section 11 of Article I of the Ohio Constitution prohibit any abridgment of the freedom of the press.

(2) The court should hold a public hearing on the motions to suppress for the same reason.

(3) The court, after completion of the public hearing on the motions to suppress, should rule on the defendant's motion for change of venue. That ruling should be made after the hearing or after a final decision on any appeal from a ruling on the motions to suppress or at trial after juror voir dire but before the administration of the jurors' oath. R. C. 2901.12(I).

If the judge concludes that because of the publicity generated by the hearing on the motions to suppress it appears that a fair and impartial trial can not be held in Montgomery County, he should grant the venue motion and transfer the case to a county unaffected by the publicity. R. C. 2901.12(I); *State, ex rel. Beacon Journal Publishing Co.,* v. *Kainrad, supra; Irvin* v. *Dowd* (1961), 366 U. S. 717; *Rideau* v. *Louisiana* (1963), 373 U. S. 723. If he concludes that a fair and impartial trial can be held in Montgomery County, he should overrule the motion for a change of venue.

Although the United States Supreme Court has not decided the specific question which the instant case presents to this court, the principles of law to be applied by the trial court with regard to the central issue which this case presents are succinctly set forth in *Sheppard* v. *Maxwell* (1966), 384 U. S. 333, by Justice Clark who delivered the opinion for the court. After listing certain actions which the trial judge should have taken to have assured Sheppard a fair trial, Justice Clark wrote the following at pages 362 and 363:

"* * * *Of course, there is nothing that proscribes the press from reporting events that transpire in the courtroom. But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity.* * * * *"* (Emphasis added.)

That rule is provided by Ohio statute. R. C. 2901.12 (I) reads:

"Notwithstanding any other requirement for the place of trial, *venue may be changed upon motion of* * * * *the defense,* * * * *to any court having jurisdiction of the subject matter outside the county in which trial would otherwise be held, when it appears that a fair and impartial trial cannot be held in the jurisdiction in which trial would otherwise be held* * * *."* (Emphasis added.)

Ohio Criminal Rule 18(B) contains a similar provision.

In *Irvin* v. *Dowd, supra* (366 U. S. 717), the United States Supreme Court considered a similar statute. That court interpreted the statute, upheld its constitutionality, applied it and vacated the judgment of the federal Court of Appeals and District Court and remanded the case to the latter, and held the judgment of the state trial court void for refusing to grant the defendant's motion for a second change of venue made necessary by intense prejudicial pretrial publicity, even though the statute did not specifically provide for a second change of venue.

The rule has been applied in Ohio with success.

In *State* v. *Hoffman* (Court of Appeals for Lucas County, No. 7551, unreported), decided August 28, 1975, appeal to the Supreme Court dismissed (No. 75-1033) January 16, 1976, an Ohio trial court took action to grant two changes of venue, on the ground of pretrial prejudicial publicity, to two different counties in a sensational murder case and by that action guaranteed the defendant his Sixth Amendment right to an impartial jury and, at the same time, preserved inviolate the First Amendment prohibition against abridgment of the freedom of the press.

In *State* v. *Hoffman, supra,* the defendant was charged and convicted of shooting his mother and father and setting fire to their bodies. The decedents were described in the press as ''socially prominent'' citizens. Lake County, in which the crime was committed, adjoins Cuyahoga County where there are two large metropolitan daily newspapers, each having broad circulation in Lake County. There was extensive publicity in both the Cuyahoga County papers and the Lake County papers following the crime. Defendant moved for a change of venue, which was granted to Trumbull County. During the trial in that county the defendant's wife purportedly attempted suicide and was confined to a Cleveland hospital. That incident received widespread publicity. There was a motion for a mistrial, on the ground of prejudicial publicity, which was denied. Later, a mistrial was granted because of a prejudicial unresponsive answer by a state's witness to a question by the prosecutor. The case was returned to Lake County. The defendant urged that the law required that the case be returned to Trumbull County for trial. That motion was denied. A defense motion for a change of venue was then made and granted. The case was transferred to Lucas County and tried in Toledo. The Lake County judge was assigned by the Chief Justice of the Supreme Court to try the case. The defendant was convicted and on appeal to the Court of Appeals for Lucas County no issue was raised concerning the denial of a fair trial by reason of

prejudicial publicity. The defendant was represented by most competent and experienced counsel. A motion for leave to appeal to the Supreme Court was denied, but there was no assignment of error in that motion on the grounds of denial of a fair trial due to prejudicial publicity.

That case represents a clear demonstration that under the provisions of Ohio law there is no reason for this state to be faced with the troublesome issues of the instant case. The large geographical area of Ohio, the large number of separate judicial trial jurisdictions, the limited intensive circulation of newspapers and the limited in-depth area coverage of television and radio stations, the law providing for change of venue to assure a fair and impartial trial, R. C. 2901.12(I), gives the trial judge adequate power to protect the defendant's constitutional right to an impartial jury, and, at the same time, to preserve inviolate the constitutional right of freedom of the press for the benefit of the public.

When there is a conflict between the First and the Sixth Amendment rights, as in the instant case, the trial court is required to act to resolve that conflict by protecting both the First and the Sixth Amendment rights when, as here, that can be done in a reasonable and lawful way. *State, ex rel. Beacon Journal Publishing Co., v. Kainrad, supra.*

The trial judge in the instant case gave little consideration to the use of a change of venue. In his opinion he said:

"* * * The defendant has already requested his change of venue, which the court now has under advisement. However, the court is of the opinion that the defendant has a right to be tried in the locale where the crime occurred, and likewise the public has a right to have such case tried in that locale."

The error in that position is apparent. First, the defendant has waived his right to be tried in the locale where the crime occurred by his motion for a change of venue. Second, it is doubtful that the public has any constitutional

right to have such a case "tried in that locale." In any event, the Supreme Court of the United States has made it clear that it is error for the trial court to deny a motion for change of venue where prejudicial news prior to trial will prevent a fair trial. *Irvin* v. *Dowd, supra* (366 U. S. 717); *Rideau* v. *Louisiana, supra* (373 U. S. 723); *Sheppard* v. *Maxwell, supra* (384 U. S. 333). See dissenting opinion in *Murphy* v. *Florida* (1975), 421 U. S. 794, 44 L. Ed. 2d 589. Any right the public has to have such a case "tried in that locale" must yield to the constitutional right of the defendant to a fair trial and the constitutionally protected freedom of the press.

CELEBREZZE, J., in his dissenting opinion, in the same manner dismisses change of venue as an alternative by which the right of a fair trial and freedom of the press can be protected. The opinion states:

"We do not believe that the interests of justice countenance the waiver of one constitutional right in order to secure another."

The defendant in the instant case moved for a change of venue prior to making his motions to suppress evidence. The statute (R. C. 2901.12[I]) authorizes such a motion for a change in venue. The trial court has that motion under advisement. By that motion, the defendant waived his right to be tried in the locale where the crime was committed. The defendant cannot be heard to complain if his own motion is granted. The Supreme Court of the United States has consistently placed its stamp of approval upon change of venue as a proper alternative for a trial court to use to avoid a denial of fair trial by reason of prejudicial publicity. *Irvin* v. *Dowd, supra* (366 U. S. 717); *Rideau* v. *Louisiana, supra* (373 U. S. 723); *Sheppard* v. *Maxwell, supra* (384 U. S. 333).

The only other reason asserted by Celebrezze, J., in his dissenting opinion, for not allowing a change of venue to assure a fair trial is stated thus:

"Finally, a change of venue presents numerous costly practical problems such as transportation of witnesses to and from the trial, and transportation of jurors to view the situs of the crime."

When the cost of transporting witnesses to and from the trial and the cost of one trip by jurors to view the situs of the kidnapping or murder is weighed against the constitutional guarantee to the defendant of a right of fair trial and the constitutional prohibition against abridgment of freedom of the press, there is no valid reason to deny the change of venue when it appears that a fair and impartial trial cannot be held because prejudicial news prior to trial will prevent it. *Irvin* v. *Dowd, supra; Sheppard* v. *Maxwell, supra,* at pages 362 and 363.

There is no reason for a trial court in this state to feel compelled, as the trial court in the instant case did, to issue an order which abridges the freedom of the press by barring a news report on what is to transpire in a judicial hearing.

There are 88 separate county judicial districts in Ohio, each with its own court of general jurisdiction. No newspaper has an intensive circulation area that extends beyond the counties that are contiguous to the county in which the newspaper is published. The in-depth coverage area of the most powerful television and radio stations does not extend to more than 30 percent of the counties of the state. One of the principal purposes of R. C. 2901.12(I) and Criminal Rule 18(B) is to provide for a change of venue in a criminal case where prejudicial publicity makes it appear that a fair and impartial trial cannot be held in the jurisdiction in which trial would otherwise be held.

Change of venue has been used for that purpose and has served that purpose. *State* v. *Hoffman, supra.*

The polestar in this case is the constitutional provisions that the freedom and liberty of the press shall not be abridged or restrained by any law.

A hearing on a motion to suppress evidence is a sensitive and extremely important proceeding. The issues

in such a hearing are often the competence, efficiency, judgment, courage and behavior of the police; the prosecutor; the defense counsel, the court employees and the judge. Because of corruption or malice, a secret judicial proceeding may be and has been used to railroad accused persons charged with crime. Secret proceedings may be used to cover up for incompetent and corrupt police, prosecutors and judges, and the influence of corrupt politicians on the judicial system. The public and the victims of crime are entitled to know what is going on. The public is entitled to know what is happening to the accused. There is no other way the busy ordinary citizen can evaluate how the judicial system is administering justice except through the media he reads, hears or watches. A free press is the only guarantee a citizen has of his right to know what is going on in his government.

It is already settled law that freedom of the press includes the right *to gather, write and publish the news;* and that "reporters * * * are plainly free to report whatever occurs in open court through their respective media." *Estes* v. *Texas* (1965), 381 U. S. 532, 541, 542. See, also; *Times-Picayune Pub. Corp.* v. *Schulingkamp* (1974), 419 U. S. 1301, 1307, 42 L. Ed. 2d 17, 22.

In *Branzburg* v. *Hayes* (1972), 408 U. S. 665, Justice White, who delivered the opinion for the court, said, at pages 681 and 707:

"We do not question the significance of free speech, press, or assembly to the country's welfare. *Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated.* * * *

"Finally, as we have earlier indicated, *news gathering is not without its First Amendment protections.* * * *" (Emphasis added.)

At pages 727 and 728, Justice Stewart, in his dissenting opinion, stated:

"*A corollary of the right to publish must be the right*

*to gather news.* The full flow of information to the public protected by the free-press guarantee would be severely curtailed if no protection whatever were afforded to the process by which news is assembled and disseminated. We have, therefore, recognized that there is a right to publish without prior governmental approval [citations omitted], and a right to receive printed matter [citation omitted].

*"No less important to the news dissemination process is the gathering of information. News must not be unnecessarily cut off at its source, for without freedom to acquire information, the right to publish would be impermissibly compromised. Accordingly, a right to gather news, of some dimensions, must exist."* (Emphasis added.)

The finding of the trial court upon which its order was based is stated as follows:

"The court finds that the intense publicity referred to at the beginning of this opinion has created a clear and present danger of serious and imminent threat to the administration of justice and that in order to prevent the possibility of further prejudicial pretrial publicity, which might affect the right of the defendant to a fair and impartial trial, the motion of the defendant must be and hereby is *SUSTAINED.*"

If the trial court is correct in that portion of its finding which states "that the intense publicity referred to at the beginning of this opinion has created a clear and present danger of serious and imminent threat to the administration of justice," then the court should have allowed the defendant's motion for a change of venue. *Sheppard v. Maxwell, supra; Irvin v. Dowd, supra; Rideau v. Louisiana, supra; State, ex rel. Beacon Journal Publishing Co., v. Kainrad, supra.*

Under Ohio law, where a motion to change venue on the ground of pretrial prejudicial publicity has been made prior to the making of a motion to suppress evidence, there is no reason for a trial court to be called upon to draw a speculative conclusion that there will be prejudicial publicity emanating from a future courtroom hearing on the mo-

tions to suppress evidence and to presume that such publicity will create a clear and present danger of serious and imminent threat to the administration of justice and, based on that speculation and presumption, to order the public barred and the press excluded from the hearing, thereby abridging the freedom of the press which is for the benefit of the public. Such a speculative and presumptive judgment by the trial court is an impossible one to make in most cases. R. C. 2901.12(I) was designed to relieve trial judges from such a dilemma and to assure that in this state freedom of the press shall not be abridged and defendants shall be guaranteed a fair trial before an impartial jury. *State, ex rel. Beacon Journal Publishing Co.*, v. *Kainrad, supra*; *Sheppard* v. *Maxwell, supra*; *Irvin* v. *Dowd, supra*; *Rideau* v. *Louisiana, supra*; *State* v. *Hoffman, supra*.

The writ of prohibition should be allowed.

*Writ allowed.*

HERBERT, STERN, W. BROWN and P. BROWN, JJ., concur. CORRIGAN and CELEBREZZE, JJ., dissent.

STERN, J., concurring. I concur in the opinion of the majority, which reaffirms principles fundamental to our society and our system of government. We cherish few values so highly as the unfettered public commerce in ideas and information ensured by the freedoms of press and speech. We guard no other right more jealously than that of an accused to a trial by a fair and impartial jury. It hardly needs repetition that "free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them." *Bridges* v. *California* (1941), 314 U. S. 252, 260. My agreement with the majority is that I believe these policies may be accommodated, consistent with the orderly administration of justice without the restrictions upon public information imposed herein, and without closing the courthouse doors.

470

The fundamental task of any trial judge is, of course, to afford a fair trial, orderly and free of bias or prejudice, before a jury willing and able to render a just verdict based upon evidence produced in court. The criminal justice system contains numerous mechanisms for assuring that our trials conform as closely as possible to that ideal.

In the great majority of criminal trials, there is only a minimum of public awareness or interest. Certainly public reliance upon the established procedures is the norm in trials of even the most serious offenses, and so too, to an extent, is public indifference. Equally certain is the fact that exceptional cases do occur which so arouse public interest and emotion that special measures must be taken to assure a fair and orderly trial. Due process applies to those exceptional cases, as to others, to require that "the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson* v. *Colorado* (1907), 205 U. S. 454, 462.

In a sizeable urban community such as Dayton, the possibility is small that public opinion concerning a case might be so dominated by fixed opinions of a defendant's guilt as to make it improbable that an impartial jury can be selected. Even in a publicized case, many citizens are likely to have paid scant attention to the case and many will be able to lay aside their preconceived notions and to render a verdict based on the evidence presented in court. On the other hand, the pervasive and ubiquitous influence of modern forms of communication pose clear dangers of inflaming or prejudicing public opinion, or of subverting the rights of a defendant by revealing "evidence" which may never be introduced at trial and which may be doubly damaging because it is subject to none of the judicial tests for reliability. The nature of the pretrial publicity in a case may involve such a probability of prejudice that an inherent lack of due process must be presumed. *Estes* v. *Texas* (1965), 381 U. S. 532.; *Rideau* v. *Louisiana* (1963), 373 U. S. 723; *Irvin* v. *Dowd* (1961), 366 U. S. 717. But the

judge's role in preventing such a deprivation of due process is hardly new, for his task remains as it has ever been, to assure the reality of a fair trial. The particular difficulty faced by a trial court in dealing with pretrial publicity is that such publicity occurs outside the judicial system, in those organs of public news and information most necessary to a free society.

The vitality of our democratic institutions depends in the long run upon broad public support and awareness of the purposes and operations of those institutions. The correction of judicial abuses and the approval of judicial wisdom and integrity depend alike upon the accessibility of the courts to public scrutiny. It is true that highly publicized cases are infrequent, and that transcripts can eventually be made available even in those cases. But as a practical matter, a transcript of a proceeding is a sterile substitute for observing the actual conduct of a hearing, as reviewing courts are well aware. Actual observation of the demeanor, voice, and gestures of the participants in a hearing must be as informative to press and public as those same matters are to juries during trial. Furthermore, as Mr. Justice Black pointed out in discussing contempt proceedings with regard to out-of-court publications pertaining to a pending case: "It must be recognized that public interest is much more likely to be kindled by a controversial event of the day than by a generalization, however penetrating, of the historian or scientist. Since they punish utterances made during the pendency of a case, the judgments below therefore produce their restrictive results at the precise time when public interest in the matters discussed would naturally be at its height. * * * It is therefore the controversies that command most interest that the decisions below would remove from the arena of public discussion." *Bridges, supra*, at pages 268-69. We most strongly doubt the advisability of any ruling which closes the doors upon those matters in which public interest is highest.

The Common Pleas Court recognized the strong public

policy favoring open courts and public trials, and permitted the closing of a hearing upon motions to suppress the evidence only because it found a clear and present danger to the administration of justice. By its terms, this seems a very strict standard. Yet, it is difficult to avoid the conclusion that the actual effect of that standard is that in any publicized case, all hearings upon motions to suppress should be *in camera*. All such cases will involve the possibility of inadmissible evidence, for admissibility is the issue in every hearing upon a motion to suppress. All such hearings are scheduled shortly before trial. This case differs from other prosecutions only in the extent of the pretrial publicity. The actual effect of the court's holding thus seems to be that a suppression hearing should be closed in any highly publicized case.

Even if the test set out by the court does mean something other than that all such hearings should be closed, that test nonetheless fails, it seems to me, because it provides little enlightenment as to what course the trial judge should follow in assuring a fair trial of a highly publicized prosecution. It does not inform us of the actual benefits of an exclusion order, nor is it very useful in determining when other, more familiar forms of judicial protective orders should be employed. The court did mention alternatives to exclusion orders, such as voir dire, continuances, sequestration, and change of venue, but its dismissal of each only reinforces the conclusion that an exclusion order such as the present one, novel though it may be, would, by its test, be imposed as a matter of course before any of those protective orders are made.

This seems to me to give too much regard to the convenience of the courts, and too little to the public's right to information.

As the United States Supreme Court stated in *Pennekamp* v. *Florida* (1946), 328 U. S. 331, 347:

"* * * Courts must have power to protect the interests of prisoners and litigants before them from unseemly efforts to pervert judicial action. In the borderline in-

stances where it is difficult to say upon which side the alleged offense falls, we think the specific freedom of public comment should weigh heavily against a possible tendency to influence pending cases. Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice.''

Our inquiry should be whether the limitations upon freedom of discussion specifically intended by this exclusion order are in fact necessitated by an ''essential requirement of the fair and orderly administration of justice.'' Thus, even if we agree that ''a clear and present danger to the administration of justice'' exists, we should go on to inquire whether that threat may be dissipated by means which do not interfere with freedom of discussion.

The finding of the trial court that a clear and present danger exists was based upon the extensive press coverage of this dramatic and vicious crime. Certainly the coverage by the media in this case was so extensive as to suggest the need to guard against public prejudice. Yet it is important to note that this coverage was exclusively factual and objective. There were no editorials demanding vengeance or asserting the defendants' guilt. The descriptions of the defendants and their backgrounds were equally objective. In fact, some of the publicity took the form of a squabble between a newspaper and a TV station as to which media had been more scrupulous in respecting the defendants' rights.

The news accounts did reveal information which might well be prejudicial, such as the defendants' past criminal records, various admissions to the police, accounts of defendants' character and background, and a report that one defendant failed a police lie detector test. All this information concerns matters which might predispose prospective jurors to a fixed opinion of guilt, and most of it would be excluded at trial. But the newspaper reports of that information does not suggest hostility or deep prejudice toward the defendants.

The rationale for closing the hearings upon the motion to suppress is that this publicity, which had been intense and at times prejudicial, created a serious and imminent threat to a fair trial. Granting that to be quite possible does not, however, necessarily justify closing the hearing. Whatever actual prejudice has occurred cannot be undone, except possibly by a continuance, nor does closing the hearing in any way restrict the press from repeating that information, from indulging in speculation as to the results of the hearing, or from publicizing whatever information may chance to leak out, however garbled. It is not so clear that the gossip spawned by keeping these matters secret might not be as damaging as more factually based reports.

The real theory underlying the exclusion order is that actual news coverage of the case will be minimized in the period before trial by reducing the amount of information available to the press, and that some material which the press has not uncovered will more likely remain secret. That theory is probably reasonable, but it remains speculative. We cannot be sure how the press will treat these stories. In other states, voluntary standards of reporting have been adopted by members of the print and electronic media. There is no apparent reason why the possibility of voluntary limitations upon reporting the hearing could not have been explored here. In fact, the prosecutor reportedly supported such an agreement. This court has no way of knowing whether the Dayton news media would have agreed to appropriate voluntary standards with regard to prejudicial information; but, if so, such an agreement would have been a less restrictive and more effective alternative to an exclusionary order, and one which could presumably be enforced if necessary by a contempt citation.

Disregarding that possibility, which is not urged by relator, and accepting *arguendo* that the previous publicity was not itself sufficient to prevent a fair trial, but that the added publicity of matters presented in the suppression hearing might very possibly tip the scales, there are other methods available to the court to reduce the release of prej-

udicial information—methods less restrictive upon free discussion.

A continuance might be granted, and I believe that a continuance to preserve a defendant's right to an impartial jury, untainted by prejudicial pretrial publicity, would be a reasonable grounds for extending the time for trial under R. C. 2945.72.

A change of venue is another constitutionally acceptable and practical alternative. The contrary view ignores the fact that in this case a motion for a change of venue was pending at the time the motions to suppress were made. In any event, Section 10 of Article I of the Ohio Constitution, which allows the accused "* * * a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed * * *." does not create a right of venue exclusively for the defendant. A change of venue may be granted, to secure an impartial jury, upon motion of the prosecution or upon the court's own motion. R. C. 2901.12(I) and Crim. R. 18. If a change of venue must be made in order to permit the trial to be "public" and the jury to be "impartial," then that is plainly sufficient to move a trial from the county. Of course, changes of venue cause inconvenience for the judiciary and prosecutorial staff as well as defendants; but the propriety of such a change is well-established by statute and rule, and a change of venue is both more effective in preventing prejudice than any exclusion order and, in some cases, is constitutionally required. *Rideau* v. *Louisiana, supra* (373 U. S. 723). If we recognize, as we must, that modern communication media pose problems for fair trials different from those in our country's early days, we should also recognize that the speed and ease of modern transportation greatly reduces the burden imposed by moving a trial to another county. Where, as here, the defendant requests a change of venue and the court finds a clear danger of prejudice from pretrial publicity, there appears little reason why the trial court should struggle to keep the trial in the county, when to do so he must refuse a defendant's

motion for a change and prevent the residents of the county from actually being informed about one of the crucial stages of the trial process. The public, the press, and the defendant all stand to lose much and gain little from such a decision.

The concern that such devices as change of venue, voir dire, sequestration, and continuance are imperfect and inconvenient devices to assure fair trials is, of course, valid. To assure the reality of a fair trial requires an impartial jury, and no technical device or test can guarantee that state of mind, i. e., that "mental attitude of appropriate indifference." (Mr. Chief Justice Hughes in *United States* v. *Wood* (1936), 299 U. S. 123, 145.) To a great extent, our legal system relies upon the likelihood that few are so influenced by pretrial information, if indeed they are aware of it, that they cannot render a fair verdict based upon the evidence produced in court. This is perhaps a generous view of human nature, but it is a view which our experience with juries has seemed to confirm, and a view upon which the integrity of our judicial system relies. Experience also has shown us some of the limitations and failings of human nature which must be given their due. We cannot, for example, expect jurors to be impartial who are aware that a defendant has confessed to a crime, even if the confession is excluded and they are instructed to disregard it. *Rideau* v. *Louisiana, supra; Irvin* v. *Dowd, supra.* See Padawer-Singer & Barton, The Impact of Pretrial Publicity on Jurors' Verdicts, in Simon, The Jury System in America, at pages 125-139.

But those dangers can be dealt with by other means than by closing a crucial stage of judicial proceedings, in those cases in which public interest and concern are greatest. In any highly publicized case, care must be taken by the trial judge to assure a fair trial, and some adjustments of judicial procedures will often be necessary. No trial judge would now be heard to say as did the judge presiding in the first *Sheppard* case, " 'How would you ever, in any jury, avoid that kind of thing?' " *Sheppard* v. *Maxwell* (1966), 384 U. S. 333, 349. Our efforts should now be direct-

ed to using those forms of orderly administration which permit the widest scope for freedom of discussion and freedom of information. Closing the courthouse doors and excluding the press and the public, if it is ever to be justified solely to prevent possible publicity, should be a matter of strictest necessity, for free access to the traditionally public proceedings of our courts and tribunals is too fundamental a value to be sacrificed if an alternative exists. There are such alternatives available to this trial court, and for that reason I believe the hearing below need not be closed. Accordingly, I concur.

CORRIGAN, J., dissenting.

*I.*

We are importuned by the Dayton Newspapers, Inc., in this original action in this court to adhibit the extraordinary writ of prohibition against the order of a judge of a Common Pleas Court to conduct certain pretrial proceedings in a criminal case in private. The order necessarily excludes the press. They protest that such an order violates the constitutional guarantee of freedom of the press.

The questions presented have provoked a pyrotechnics of extended rhetoric in connection with the decision of the court that tends to point up the importance of the case. Accordingly, I am constrained to succinctly state my reasons for dissenting from the majority.

The paramount concern of the judge in the trial court is the constitutional right of Herman Lee Moore, American citizen, to receive a speedy and public trial before an impartial jury in Montgomery County on the indictment charging him with kidnapping, extortion and aggravated murder.

It was this concern that motivated the judge to enter a protective order that hearings on defendant's pretrial motions to suppress be held *in camera*. The judge said: "The court finds that the intense publicity referred to at the beginning of this opinion has created a clear and present danger of a serious and imminent threat to the ad-

ministration of justice and that in order to prevent the possibility of further prejudicial pretrial publicity, which might affect the right of the defendant to a fair and impartial trial, the motion of defendant [to hold all pretrial hearings in his case *in camera*] must be and hereby is SUSTAINED.''

Based upon what was presented to him in the hearing on said motion, the trial judge exercised his best judgment to protect the constitutional right of defendant to an impartial jury in his trial on the indictment. His right to a fair trial before an impartial jury is not superseded by the constitutional right of the relator herein, Dayton Newspapers, Inc., to the First Amendment freedom of the press in pretrial proceedings. The United States Constitution does not declare the right of freedom of the press to be superior to defendant's Sixth Amendment right to a speedy and public trial before an impartial jury of the district wherein the crime has been committed. Nor does that Constitution state that any declared right has a preferred position. To so hold that freedom of the press is a preferred right would be to relegate Moore's right to a fair trial before an impartial jury to a deferred position as a second-class right. Such a view would be constitutionally untenable. Moore's right truly belongs in the catalog of indispensable freedoms.

It may be said that publicity ordinarily serves to assure a fair trial, but in this instance the trial judge, in his effort to guarantee this right to defendant, seeks to insulate prospective jurors from reading about evidence, presented on pretrial motions to suppress, which may be inadmissible at the trial but which may arouse intense feelings in the community about the crimes charged against defendant. If, before a trial, the right to publish inadmissible evidence is inseparable from our freedoms, then the trend of trials to turn on evidence and influence beyond the control of the judge may be expected to continue. We certainly do not need another Sam Sheppard type perversion of justice.

In sensational cases like this the fact emerges that the

court faces grave problems in making good the constitutional assurance of fair trial before an impartial jury except with the cooperation of the agencies that make and convey public opinion. If these agencies do not respect the judicial process sufficiently to forego scooping it, pressuring it, or circumventing it, then a fair trial before an impartial jury for an individual charged with a crime may in actuality descend to a second-class constitutional right.

But, the Dayton Newspapers, Inc., a corporation for profit, says in effect that we and we alone should make the decisions as to what and when to publish; that this is our First Amendment right as to freedom of the press.

*II.*

The Constitution of Ohio provides in Section 11 of Article I:

"* * * and no law shall be passed to restrain or abridge the liberty of speech, or of the press. * * *"

It speaks, too, about an impartial jury in Section 10, Article I, in part:

"* * * In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel * * * to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed * * *."

In connection with the latter, this court stated many years ago in *Cooper* v. *State* (1865), 16 Ohio St. 328, 331, that "[t]he right of the accused to an impartial jury cannot be abridged."

A few years later it was held in *Frazier* v. *State* (1873), 23 Ohio St. 551, 552, that:

"The constitution guaranties [*sic*] to the accused a 'trial by an impartial jury.' This right cannot be impaired. But what will constitute the abridgment of the right is, of necessity, a judicial question."

That question was developed a little more in *Baxter* v. *State* (1914), 91 Ohio St. 167, 169:

"While the question of a change of venue in a criminal

case is within the sound discretion of the trial court, yet it is a substantial right of the defendant to be tried by a fair and impartial jury.''

I therefore dissent from the syllabus, opinion and judgment of the majority.

CELEBREZZE, J., dissenting. The present appeal presents issues striking at the very core of our judicial system. It involves the interplay between the First Amendment right of the media to freedom of the press and the Sixth and Fourteenth Amendment rights of an accused criminal to a fair trial and due process of law. Because, in my view, the opinion expressing the conclusions of a majority of this court, authored by O'Neill, C. J., fails to accurately and completely address any one of the several serious issues raised by this appeal, I feel compelled to submit the following lengthy dissent. I shall adopt an unusual format as the vehicle by which to express my views, because the traditional method utilized in writing a dissenting opinion may not adequately exacerbate the differences in approach to the problem I perceive to be most relevant in arriving at a resolution of these issues. Accordingly, I submit the following dissent written as if it were a majority opinion.

One further introductory comment is in order. In my view, the following approach to resolution of the instant cause does not impermissibly restrain freedom of the press while protecting both the rights of a defendant to a fair trial and due process of law and the duty of a trial court to ensure that such occurs. It does, however, repose discretion in the trial court to order that *pretrial* hearings be held *in camera* in those rare instances when the circumstances command, and permits review thereof in this court as to the correctness of any such order. A balance is thus struck between the competing constitutional rights here involved. Such a balance is constitutionally required, for no one of the freedoms secured by the Bill of Rights should be favored over another. The effect of the majority view, I fear, is to prefer the First Amendment at the expense of justice and the Sixth and Fourteenth Amendments.

With these preliminary comments, I offer the following syllabus paragraphs, statement of the case and opinion as my conception of the *proper* majority view in this case.

1. The conditions which must exist to support the issuance of a writ of prohibition are: (1) The court or officer against whom it is sought must be about to exercise judicial or quasi-judicial power; (2) the exercise of such power must be unauthorized by law; and (3) it must appear that the refusal of the writ would result in injury for which there is no other adequate remedy. (*State, ex rel. Lehmann,* v. *Cmich,* 23 Ohio St. 2d 11, followed.)

2. A party has standing if, in either an individual or representative capacity, he has some real interest in the subject matter of the dispute.

3. Where a trial court issues an order excluding the various media representatives, as a part of the general public, from attendance at a judicial proceeding, those media representatives, by virtue of the First Amendment Freedom of the Press Clause, possess the requisite standing to contest such order by way of an original action in prohibition.

4. Section 16, Article I of the Ohio Constitution does not confer upon the public or the media the absolute right to be present at every judicial proceeding; but, rather, provides all persons with a forum in which to litigate their legal rights in an orderly manner.

5. The right to a public trial does not belong solely to an accused; it belongs as well to the general public, subject to exception in extraordinary circumstances in order to preserve the fair administration of justice.

6. Freedom of the press and the right to trial by an impartial jury are both fundamental to our system of government, and should be given the maximum possible protection.

7. It is the function of the court to protect the constitutional rights of an accused, and not place him in a position where he must waive his right to a jury trial or request a change of venue in order to avoid the risk of being

tried by jurors who may have read, viewed or heard testimony taken at a recent pretrial hearing and ultimately determined to be inadmissible at trial.

8. In a pretrial hearing on a motion to suppress evidence, the defendant may move that all or any part of the hearing be closed to the general public, including representatives of the media, on the ground that dissemination of evidence or argument adduced at the hearing may disclose matters that will be inadmissible in evidence at the trial, and is therefore likely to interfere with his constitutional right to a fair trial by an impartial tribunal.

9. When the circumstances clearly establish that the judicial process will be subverted by an open pretrial hearing, appropriate action should be taken by a court to preserve the integrity and fairness of such judicial process. In this regard, a trial court may consider ordering the general public, including media representatives, excluded from attendance at such pretrial hearing, but such order should issue only in extraordinary circumstances upon a clear showing of a serious and imminent threat to the administration of justice.

— — — — — —

On or about September 23, 1975, Lester Emoff, a prominent Dayton businessman, was kidnapped and held for ransom. His abductor(s) left a ransom note[2] at the home

---

[2] The ransom note was printed verbatim in the October 8, 1975, edition of the Dayton Journal Herald, under the caption "EMOFF ransom note released." It states:

"Robert Emoff by 12:00 noon tomorrow, you should have in your possession the sum of Four-Hundred-Thousand Dollars ($400,000.00) in bills of tens and twenties. Money will be checked for unfamiliar markings. Police will not be contacted.

"Money is for the ransom of Lester Emoff. If these demands are not carried out to the letter, Lester Emoff and car with tag No. 866-PE will be destroyed with dynamite along with all three stores and your warehouse.

"At 12:00 noon tomorrow, you are to leave your house with the money in the green car, tag No. 7947-DV and proceed to the Sohio station on Riverview and Philadelphia Dr. Inside the station you will receive further instructions at exactly 12:05 by phone. You will be timed 30 mph."

of his son, Robert Emoff, demanding $400,000 to secure his release, and to prevent the physical destruction of his business premises. Following the instructions of the abductor (s), Mr. Emoff's family paid the $400,000 as ordered. The body of Mr. Emoff was subsequently located bearing indications that he had been brutally murdered.

On or about September 26, 1975, Herman Lee Moore, Albert Lee Scott, Jr., and Willis Leroy were arrested and later charged with kidnapping, extortion, and the aggravated murder of Lester Emoff. On October 1, 1975, the Montgomery County Grand Jury returned indictments against these three men on such charges.

The *Emoff* case engendered widespread and intense comment in both the print and electronic media. On October 2, 1975, apparently as a result of a Dayton Daily News article disclosing that one of the suspects, Albert Lee Scott, Jr., had failed a police lie detector test, Judge Stanley S. Phillips issued a "gag order" restraining law enforcement officials, prosecutors, and defense attorneys from discussing the case with news media representatives. The next day he modified the order to restrain the above persons from divulging the following information to the media: A prior criminal record of any suspects; the existence or contents of any confession, admission or statement; the identity of prospective witnesses; the possibility of a change of plea in the case; and any opinions of the accused's guilt or innocence or of the merits of the case.

On October 23, 1975, counsel for defendant Moore filed three pretrial motions[3] to suppress: (1) "* * * all tangible evidence obtained from the defendant by any law enforcement officer;" (2) "any and all statement(s) made by the defendant to any law enforcement officer, whether said statement(s) be exculpatory or inculpatory;" and (3) "evidence of pre-trial identification and courtroom identification at trial of the within cause."

On October 28 1975, defendant Moore, through counsel, filed an additional motion requesting the trial court to hold all pretrial hearings in his case *in camera*. In the mo-

---

[3] Defense counsel subsequently filed a motion for change of venue.

tion, defendant Moore specifically waived the rights provided him by the Sixth Amendment to the Constitution of the United States and by Section 10, Article I, of the Constitution of the state of Ohio as they relate to his motion.

The trial court, on October 29, 1975, ordered a hearing on defendant Moore's *in camera* motion, and invited counsel for the news media in the Dayton area to file briefs *amicus curiae*. A hearing was duly held, at which time counsel for the relator appeared to present its position.

On November 4, 1975, respondent, Stanley S. Phillips, Judge of the Court of Common Pleas of Montgomery County, issued a lengthy opinion sustaining defendant Moore's motion to exclude the public, including representatives of the press, from all pretrial suppression hearings in the case of *State* v. *Moore*, case No. 75-CR-1353.

Judge Phillips, in his opinion, stated: "Counsel for the defendant in a motion for change of venue has supplied to the court a series of exhibits which are clippings from local newspapers beginning with the date of September 26, 1975. In that short time reference; that is, from the date of arrest until the present day, over seventy-five articles have appeared in the local newspapers relative to the crime charged herein. This, of course, does not take into account the multitude of references to this matter which have been made by the radio and television stations of this locale.

"The court finds then that the publicity in this matter has been and would appear to continue to be extremely intense. * * * Under the time frame with which the court finds itself confronted, trial on the merits will commence approximately one week after the hearing on the motions. At this time the court, of course is unaware of what may be developed at such motion hearing, but a reading of the motions makes it clear that statements and other highly incriminating matters will be discussed. Prospective jurors cannot help but to be exposed to such matters. The court is of the opinion that it would be equally damaging to the defendant's right to a fair trial to have a headline appear the week before trial indicating either that the court has

excluded particular evidence or ruled same admissible."

Judge Phillips concluded: "The court finds that the intense publicity referred to at the beginning of this opinion has created a clear and present danger of a serious and imminent threat to the administration of justice and that in order to prevent the possibility of further prejudicial pretrial publicity, which might affect the right of the defendant to a fair and impartial trial, the motion of the defendant must be and hereby is SUSTAINED."

Later that same day, November 4, 1975, relator, Dayton Newspapers, Inc., filed an original action in prohibition in the Court of Appeals for Montgomery County. That court denied relator's motion, on November 7, 1975.

Thereafter, on November 10, 1975, relator voluntarily dismissed its action in the Court of Appeals, and filed an original action in this court seeking a writ of prohibition to restrain respondent from enforcing his order.

A hearing was held before four members of this court on Veterans Day, November 11, 1975, upon relator's motion for an alternative writ of prohibition, and, on November 12, 1975, by a 4—3 vote, this court allowed relator's motion, effectively staying respondent's order.

The respective briefs were timely filed, and oral argument was held upon relator's complaint in prohibition, on December 17, 1975.

The cause is now before this court for decision upon the merits.[*]

Relator advances seven propositions of law which, upon distillation, emerge as four separate issues requiring our consideration. Stated briefly, these issues are: (1) Whether prohibition is a proper remedy under the circumstances of this case; (2) whether relator has "standing" to litigate the within cause; (3) whether Section 16, Article I of the Ohio Constitution, either standing alone or considered in conjunction with Section 10, Article I, of the Ohio Constitution, confers upon the public, generally, and the press,

---

[*]Additional facts are stated later in the opinion.

particularly, the right to be present at *all* judicial proceedings; and (4) whether a trial judge may constitutionally conduct a pretrial suppression hearing in a widely publicized criminal case *in camera*, thereby excluding therefrom all members of the general public, including representatives of the print and electronic media. Although these issues sometimes overlap, we will, in the interests of clarity and organization, discuss each issue separately in the context of this opinion.

## I. *PROHIBITION*

Section 2(B) (1) (d), Article IV, of the Ohio Constitution states as follows:

"The Supreme Court shall have original jurisdiction in the following:

"(d) Prohibition * * *"

In *State, ex rel. Lehmann*, v. *Cmich* (1970), 23 Ohio St. 2d 11, the court held that a writ of prohibition will be issued only if the following three conditions are proved to exist: "(1) The court or officer against whom it is sought must be about to exercise judicial or quasi-judicial power; (2) the exercise of such power must be unauthorized by law;[5] and (3) it must appear that the refusal of the writ would result in injury for which there is no other adequate remedy. *State, ex rel. Caley*, v. *Tax Comm.*, 129 Ohio St. 83, at 87." Accord, *State, ex rel. Bell*, v. *Blair* (1975), 43 Ohio St. 2d 95, 96; *State, ex rel. Susi*, v. *Flowers* (1975), 43 Ohio St. 2d 11, 13; *State, ex rel. McKee*, v. *Cooper* (1974), 40 Ohio St. 2d 65.

With respect to the first condition mandated by *Cmich*, *supra*, it is axiomatic that Judge Phillips' order excluding the various media representatives, as well as the general public, from all pretrial suppression hearings in the case of *State* v. *Moore* was an exercise of judicial power.

---

[5] This condition has been alternatively stated as "the exercise of such power must amount to an unauthorized usurpation of judicial power." See *State, ex rel. Northern Ohio Telephone Co.*, v. *Winter* (1970), 23 Ohio St. 2d 6, 8 and cases cited therein. See, also, *State, ex rel. Cooper*, v. *Ater* (1974), 38 Ohio St. 2d 229, 231; *State, ex rel. Allied Chemical Corp.*, v. *Earhart* (1974), 37 Ohio St. 2d 153, 155.

It is equally clear that no other adequate remedy exists which is available to relator. In *State, ex rel Jackman,* v. *Court of Common Pleas of Cuyahoga County.* (1967), 9 Ohio St. 2d 159, relators sought to restrain a trial court from forcing them to submit to depositions in a first-degree murder trial. Although we denied issuance of the requested writ of prohibition in that case, we acknowledged that prohibition was the proper procedural avenue by which to contest the trial court's ruling under the circumstances presented therein. In this regard we stated: "* * * it affirmatively appears that relators have no plain and adequate remedy in the ordinary course of the law * * *. Nor would any remedy in the Common Pleas Court * * * be appropriate, since it is that court's action that is being challenged.

"Therefore, since the relators seek to prevent an alleged usurpation of the judicial power and are without a plain and adequate remedy in the ordinary course of the law, resort to the writ of prohibition was correct by any standard that this court has fashioned for extraordinary remedies." (Citations omitted.) 9 Ohio St. 2d at 160.

Since it is undisputed that the trial court possessed jurisdiction to preside over the case of *State* v. *Moore,* the question remains whether Judge Phillips' order was "unauthorized by law.'"

At the outset, we note that neither party has cited to us, nor have we discovered, any statutory provision,[8] con-

---

[6]R. C. 2931.03 provides, in pertinent part: "The Court of Common Pleas has original jurisdiction of all crimes and offenses * * *."

[7]Respondent maintains that the real issue before this court is whether his order amounted to an abuse of discretion. In *State, ex rel. Gross,* v. *Marshall* (1974), 39 Ohio St. 2d 92, we clearly rejected such contention when, quoting *State, ex rel. Staton,* v. *Common Pleas Court* (1965), 5 Ohio St. 2d 17, 22, we held: "* * * Prohibition is not concerned with the exercise of discretion by an inferior tribunal having jurisdiction of the subject matter and the parties in a cause before it. That issue is for the determination of a reviewing court." 39 Ohio St. 2d at 94.

[8]Cf. Code of Ala., Title 15, Section 320; Ark. Stat. Ann., Section 43-615; Cal. Penal Code Ann., Section 868; Iowa Code Ann., Section 761.13; Mont. Rev. Code Ann., Section 95-1202.

488

stitutional source, or court rule[9] in this state[10] empowering a trial court to exclude the general public, including representatives of the media, from a pretrial hearing in a criminal case.

Respondent contends, and we agree, that a trial judge possesses inherent power to control any proceeding before him.

Though not directly in point, in *State* v. *Hensley* (1906), 75 Ohio St. 255, 265, this court stated the following: "It is not intended here to indicate that the trial judge is without power to exclude from the court room during the trial of a criminal case individuals, though adults, who are, by reason of habits or physical condition, personally obnoxious, or persons who by their conduct interrupt the orderly course of business * * * nor is it doubted that persons whose attendance is for the express and only purpose of using the information thus obtained in a way calculated to directly obstruct the administration of justice may be excluded. * * * Much should be, and we think is, necessarily and properly left to the trial judge, who is obliged to insist upon the orderly conduct of the public business, and whose highest duty is the securing to the parties, the defendant as well as the state, a fair and impartial trial * * *."

Such inherent power emanates from the very creation and existence of the court itself, and is imperative to the preservation of the fairness and orderliness of the administration of justice. Other state and federal courts have recognized the existence of such power. *Illinois* v. *Allen* (1970), 397 U. S. 337; *State, ex rel. Gore Newspapers*, v. *Tyson* (Fla. App. 1975), 313 So. 2d 777; *People* v. *Hinton* (1972), 31 N. Y. 2d 71, 286 N. E. 2d 265, certiorari denied 410 U. S. 911; *Des Moines Register & Tribune Co.* v. *Hild-*

---

[9]Cf. Arizona Rules of Criminal Procedure, Rule 9.3(b); District of Columbia Superior Court Rules of Criminal Procedure, Rule 53.

[10]Crim. R. 57(B) does provide: "If no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules of criminal procedure, and shall look to the rules of civil procedure and to the applicable law if no rule of criminal procedure exists."

*reth* (Iowa, 1970), 181 N. W. 2d 216; *Schavey* v. *Roylston*, 8 Ariz. App. 574, 448 P. 2d 418; *United States, ex rel. Bruno*, v. *Herold* (C. A. 2, 1966), 368 F. 2d 187; *State* v. *Velasquez* (1966), 76 N. M. 49, 412 P. 2d 4; *State* v. *Jackson* (1964), 43 N. J. 148, 203 A. 2d 1; *Kirstowsky* v. *Superior Court* (1956), 143 Cal. App. 2d 745, 300 P. 2d 163. See, also, *Branzburg* v. *Hayes* (1972), 408 U. S. 665.

The circumstances in which courts have exercised this inherent power to control judicial proceedings are varied, and will be discussed in more detail in Part III of this opinion.

At this point we do recognize, however, that there is authority supporting respondent's order excluding the public and the press from attendance at a judicial hearing.[11] Although whether such exclusion is justified must necessarily depend upon the particular factual circum-

---

[11]See, *e. g., United States* v. *Bell* (C. A. 2, 1972), 464 F. 2d 667, certiorari denied, 409 U. S. 991. In *Bell*, in upholding the action of the trial court in conducting a portion of a pretrial suppression hearing *in camera* in order to protect the confidentiality of the "hijacker profile" developed by the Federal Aviation Administration, the court stated:

"Barring the public including the press from the suppression hearing in this case presents no great constitutional difficulty. While secret proceedings are of course odious and smack of ideologies as repugnant to the Founders as they are today, there is precedent for the proposition that limited exceptions are constitutionally permissible. Thus the exclusion of the public in whole or in part has been found constitutionally acceptable where it was deemed necessary to protect the defendant, *Sheppard* v. *Maxwell*, 384 U. S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966); *Estes* v. *Texas*, 381 U. S. 532, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965), where there has been harassment of witnesses, *United States, ex rel. Bruno*, v. *Herold*, 408 F. 2d 125 (2d Cir. 1969), cert. denied, 397 U. S. 957, 90 S. Ct. 947, 25 L. Ed. 2d 141 (1970), or to preserve order, *United States, ex rel. Orlando*, v. *Fay*, 350 F. 2d 967 (2d Cir. 1965), certiorari denied, 384 U. S. 1008, 86 S. Ct. 1961, 16 L. Ed. 2d 1021 (1966). The justification for the limited exclusion here in our view, protection of the air travelling public, presents at least as substantial a consideration as those which prompted the previously recognized exceptions." Accord *United States* v. *Slocum* (C. A. 3, 1972), 464 F. 2d 1180. See, also, *People* v. *Pratt* (3d Dep't 1967), 27 App. Div. 2d 199, 278 N. Y. S. 2d 89; *People* v. *Marturano* (4th Dep't 1965), 24 App. Div. 2d 733, 263 N. Y. S. 2d 469. Annotation, 49 A. L. R. 3d 1007. Cf. *Oliver* v. *Postel* (1972), 30 N. Y. 2d 171, 282 N. E. 2d 306.

stances involved, as a general rule, the *power* to exclude exists.

Accordingly, we conclude that prohibition is the proper procedure applicable under the circumstances of this case. Indeed, it is the only procedural mechanism by which the instant controversy could be presented in a form traditionally capable of adjudication. We leave resolution of whether Judge Phillips' order was "unauthorized by law" under the circumstances of this case to Part IV of this opinion.

## II. *STANDING*

Relator contends that it has the requisite standing to litigate the within action because it "has a significant interest which it seeks to vindicate." Relator argues that it seeks to protect its: (1) Common law right to observe the administration of criminal justice; (2) First Amendment right to gather and disseminate news; and (3) Ohio constitutional right of access to an open court.

Relator maintains that it meets the various tests of standing utilized by the United States Supreme Court, as evidenced by the decisions in *United States* v. *Richardson* (1974), 418 U. S. 166, 178 (danger of direct injury); *Schlesinger* v. *Reservists Comm. to Stop the War* (1974), 418 U. S. 208, 220 (actual or threatened concrete injury); *Sierra Club* v. *Morton* (1972), 405 U. S. 727, 731 (sufficient interest); *Data Processing Service* v. *Camp* (1970), 397 U. S. 150, 153 (injury in fact and location of interest within protected zone of interests); and *Baker* v. *Carr* (1962), 369 U. S. 186 (personal stake).

Relator maintains further that it meets the test of standing stated by this court most recently in *State, ex rel. Dallman,* v. *Court of Common Pleas* (1973), 35 Ohio St. 2d 176. In *Dallman,* at page 178, the court quoted the following statement from *Sierra Club* v. *Morton, supra,* as indicative of the manner in which the United States Supreme Court analyzes the issue of standing:

"* * * Where the party does not rely on any specific statute authorizing invocation of the judicial process, the

question of standing depends upon whether the party has alleged such a 'personal stake in the outcome of the controversy,' *Baker* v. *Carr*, 369 U. S. 186 * * * as to ensure that 'the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.' *Flast* v. *Cohen*, 392 U. S. 83 * * *.''

The court, in *Dallman*, then concluded, at page 179, that "a party lacks standing to invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the subject matter of the action."

The "real interest" that confers standing upon a litigant can emanate from noneconomic as well as economic involvement. In the First Amendment area, the Supreme Court has concluded that a person may have a spiritual interest sufficient to give standing to raise the issue concerning the Establishment Clause and the Free Exercise Clause. *Abington School Dist.* v. *Schempp* (1963), 374 U. S. 203. Lower federal courts have found aesthetic, conservational and recreational interests sufficient to confer standing upon a litigant. See *Scenic Hudson Preservation Conf.* v. *FPC* (C. A. 2, 1965), 354 F. 2d 608, 616, certiorari denied, 384 U. S. 941.

In the recent case of *CBS, Inc.,* v. *Young* (C. A. 6, 1975), 522 F. 2d 234, the court considered the issue of standing in the context of a First Amendment challenge by media representatives directed at a "gag order" issued by a trial judge who had restrained "in addition to all counsel and court personnel, all parties concerned with this litigation, whether plaintiffs or defendants, their relatives, close friends, and associates * * * from discussing in any manner whatsoever these cases with members of the news media or the public." 522 F. 2d at 236.

The court, in *Young*, utilized the two-prong test of standing enunciated in *Data Processing Service* v. *Camp, supra*, and determined that the petitioner (CBS) possessed the requisite standing. The court reasoned that the respon-

492

dent's order "at least arguably impairs rights guaranteed to the petitioner by the First Amendment. * * * The fact remains that its ability to gather the news concerning the trial is directly impaired or curtailed. The protected right to publish the news would be of little value in the absence of sources from which to obtain it. This was recognized by the Supreme Court in *Branzburg* v. *Hayes*, 408 U. S. 665, 681, 92 S. Ct. 2646, 2656, 33 L. Ed. 2d 626 (1972), where the court stated: 'Without some protection for seeking out of the news, freedom of the press could be eviscerated.' News gathering thus qualifies for First Amendment protection." 522 F. 2d at 237-238. See, also, *State, ex rel. Gore Newspapers Co.,* v. *Tyson, supra* (313 So. 2d 777); *Oliver* v. *Postel* (1972), 30 N. Y. 2d 171, 282 N. E. 2d 306; *Phoenix Newspapers* v. *Jennings* (1971), 107 Ariz. 557, 490 P. 2d 563; *Oxnard Publishing Co.* v. *Superior Court* of *Ventura County* (Ct. of App. 1968), 68 Cal. Rptr. 83, 88; *E. W. Scripps Co.* v. *Fulton* (1955), 100 Ohio App. 157, appeal dismissed, 164 Ohio St. 261.

We agree with the analysis utilized by the circuit court in *Young*, that in a proper case media representatives possess standing to contest judicial action in an attempt to protect their First Amendment rights. In the present case, relator seeks to ensure that its freedom to publish information concerning a pending criminal action, as well as its interest in gathering such information, is not eviscerated by judicial fiat.

Relator is in the business of disseminating news, and undisputably, the Emoff murder trial presents a matter of news interest. It is clear that relator will, itself, suffer injury to the interests it seeks to protect should the order of the trial court be sustained. In this regard, relator's potential injury is direct as opposed to abstract or derivative. Compare *Data Processing Service* v. *Camp, supra* (397 U. S. 150), with *Schlesinger* v. *Reservists to Stop the War, supra* (418 U. S. 208); *O'Shea* v. *Littleton* (1974), 414 U. S. 488; and *Sierra Club* v. *Morton, supra* (405 U. S. 727.)

Accordingly, we conclude that relator possesses the req-

uisite "standing" to litigate the within action in an attempt to exercise its First Amendment right to gather news.[12] Such result is consistent with the test enunciated by this court in *Dallman, supra,* and with the holding of the Supreme Court in *United States* v. *SCRAP* (1973), 412 U. S. 669, 689, at fn. 14, wherein the court stated that: "* * * We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, see *Baker* v. *Carr*, 369 U. S. 186; a five-dollar fine and costs, see *McGowan* v. *Maryland*, 366 U. S. 420; and a $1.50 poll tax, see *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663."

### III. *OPEN COURT—PUBLIC TRIAL*

Section 16, Article I, of the Ohio Constitution provides, in pertinent part:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

Relator contends that this provision, when read together with Section 10, Article I, of the Ohio Constitution,[13] clearly establishes the right of the public and the press to attend all judicial proceedings in order to observe the administration of justice. It is asserted that recognition of the public's right in this regard is essential to ensure scrutinization of the judicial process of government, and particularly so in the instant cause as the propriety of the

[12]Such right is not, however, absolute in all contexts. See *Branzburg* v. *Hayes* (1972), 408 U. S. 665, 684; *Zemel* v. *Rusk* (1965), 381 U. S. 1, 16-17; *State* v. *Meek* (1969), 9 Ariz. App. 149, 152, 450 P. 2d 115, certiorari denied, 396 U. S. 847.

[13]"* * * In any trial, in any court. the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed * * *."

conduct of the law enforcement officials has been challenged by defendant Moore on constitutional grounds.

We are mindful of the wealth of existing authority with regard to the issue of "the right to a public trial." Such right is generally recognized as inuring to the accused alone,[14] although there is some authority extending that right to the public[15] and, consequently, to the press. It has also been held that, while an accused may waive his right to a public trial, he cannot force a private trial. See, e. g., People v. Holder (1972), 70 Misc. 2d 31, 332 N. Y. S. 2d 933; Phoenix Newspapers v. Superior Court (1966) 101 Ariz. 257, 418 P. 2d 594; Singer v. United States (1965), 380 U. S. 24 (dictum); United States v. Kobli (C. A. 3, 1949), 172 F. 2d 919 (by implication).

Perhaps the best statement of the reason behind the right of an accused to a public trial appears in In re Oliver, supra (333 U. S. 257), as follows: "The traditional Anglo-American distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the lettre de cachet. All of these institutions obviously symbolized a menace to liberty. In the hands of despotic groups each of them had become an instrument for the suppression of political and religious heresies in ruthless disregard of the right of an accused to a fair trial. Whatever other benefits the guarantee to an accused that his trial be conducted in

---

[14]See Estes v. Texas (1965), 381 U. S. 532, 538; Singer v. United States (1965), 380 U. S. 24, 35; In re Oliver (1948), 333 U. S. 257, 268. See, generally, Douglas. The Public Trial and the Free Press, 46 A. B. A. J. 840 (1960) and Note, The Accused's Right to a Public Trial. 49 Colum. L. Rev. 110 (1949).

[15]United States v. Clark (C. A. 2, 1973), 475 F. 2d 240; United States, ex rel. Bennett, v. Rundle (C. A. 3, 1969), 419 F. 2d 599; United States v. Lopez (E. D. N. Y. 1971), 328 F. Supp. 1077; United States, ex rel. Mayberry, v. Yeager (D. N. J. 1971), 321 F. Supp. 199; Oxnard Publishing Co. v. Superior Court of Ventura County (1968), 68 Cal. Rptr. 83; E. W. Scripps Co. v. Fulton, supra (1955), 100 Ohio App. 157, appeal dismissed, 164 Ohio St. 261; State v. Copp (1844), 15 N. H. 212.

public may confer upon our society, the guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." (Footnotes omitted.) 333 U. S. at 268-270. This principle has been repeatedly affirmed by the United States Supreme Court,[16] by federal[1] and state[18] courts, and has produced considerable academic comment[19] as well.

Although we agree generally with the above principle and the reasons supporting it, we are constrained to indicate that "the right to a public trial" is not absolute. It has been held subject to the power of the trial court to preserve the fairness and orderliness of the trial,[20] to protect wit-

[16] See, e. g., Estes v. Texas, supra (381 U. S. at 538-539), and Sheppard v. Maxwell, supra (384 U. S. at 349); Cf. Faretta v. California (1975), 422 U. S. 806.

[17] See, e. g., Aaron v. Capps (C. A. 5, 1975), 507 F. 2d 685; United States, ex rel., Smallwood, v. LaValle (E. D. N. Y. 1974), 377 F. Supp. 1148, affirmed, 508 F. 2d 837, certiorari denied, 421 U. S. 92t, (1975); United States, ex rel. Bennett, v. Rundle (C. A. 3, 1970), 41 F. 2d 599; Lewis v. Peyton (C. A. 4, 1965), 352 F. 2d 791.

[18] See, e. g., State v. Snyder (Iowa 1974), 223 N. W. 2d 217; State v. Blake (N. H. 1973), 305 A. 2d 300; Commonwealth v. Pierce (Pa 1973), 303 A. 2d 209; Johnson v. Simpson (Ky. 1968), 433 S. W. 2d 644; Kirstowsky v. Superior Court (Cal. App. 1956), 143 C. A. 2d 745 300 P. 2d 163.

[19] Comment: Criminal Law—Right to a Public Trial—Where Defendant Has Competent Counsel a Failure to Assert Such Right Constitutes a Waiver, 35 Albany L. R. 835 (1971); Fair Trial v. Freedom of the Press in Criminal Cases, 35 Temple L. Q. 412 (1962); Goldfarb, Public Information, Criminal Trials and the Cause Celebre, 36 N. Y. U. L. Rev. 810 (1961); Douglas, The Public Trial and the Free Press, 46 A. B. A. J. 840 (1960); Wiggins, The Public's Right to Public Trial, 19 F. R. D. 25 (1955); Note, The Accused's Right to a Public Trial, 49 Colum. L. Rev. 110 (1949); Radin, The Right to a Public Trial, 6 Temple L. Q. 381 (1932).

[20] See, e. g., United States, ex rel. Bruno, v. Herold (C. A. 2, 1966), 368 F. 2d 187; United States, ex rel. Orlando, v. Fay (C. A. 2, 1965), 350 F. 2d 967, certiorari denied, Orlando v. Folette, 384 U. S. 1008 (1966) (press remained, however).

nesses,[21] and to maintain the confidentiality of certain information.[22]

Moreover, in the instant case, since the accused has expressly waived his Ohio (Section 10, Article I) and federal (Sixth Amendment) constitutional rights to a public trial, the issue now before this court is limited solely to the right of the public, generally, and the media, specifically, to attend *all* judicial proceedings.

Relator relies upon *E. W. Scripps Co.* v. *Fulton* (1955), 100 Ohio App. 157, appeal dismissed, 164 Ohio St. 261 in support of its assertion. Although there is language in the *Fulton* opinion which does indeed support relator's position,[23] we do not read *Fulton* as broadly as relator suggests.

---

[21] *United States, ex rel. Lloyd*, v. *Vincent* (C. A. 2, 1975), 520 F. 2d 1272; *United States, ex rel. Bruno*, v. *Herold* (C. A. 2, 1969), 408 F. 2d 125, certiorari denied, 397 U. S. 957 (1970) ; *United States, ex rel. Smallwood* v. *LaValle, supra* (fn. 17) ; *State* v. *Gee* (S. C. 1974), 204 S. E. 2d 727; *People* v. *Hinton* (1972), 31 N. Y. 2d 71, 286 N. E. 2d 265, certiorari denied, 410 U. S. 911 (1973) ; *Kirstowsky* v. *Superior Court, supra* (300 P. 2d 163).

[22] *United States* v. *Bell* (C. A. 2, 1972), 464 F. 2d 667, certiorari denied, 409 U. S. 991 (public and defendant excluded only during limited portion of pretrial suppression hearing dealing with "skyjacker profile") ; *United States* v. *Slocum* (C. A. 3, 1972), 464 F. 2d 1180 (same as *Bell*). Cf. *United States* v. *Ruiz-Estrella* (C. A. 2, 1973), 481 F. 2d 723, and *United States* v. *Clark, supra* (475 F. 2d 240) (exclusion of the public and defendant during a pretrial suppression hearing held to be violative of accused's Sixth Amendment rights to public trial and confrontation of witnesses where testimony elicited related to matters other than "skyjacker profile"). See, also, *Levine* v. *United States* (1960), 362 U. S. 610, and *In re Di Bella* (C. A. 2, 1975), 518 F. 2d 955 (exclusion of public during portion of contempt proceeding when minutes of grand jury were read held not violative of accused's Sixth Amendment right to a public trial).

[23] In paragraph three of the syllabus in *Fulton*, the court held:

"The section of the Constitution providing that a defendant is entitled to a public trial is primarily for his benefit, but does not guarantee him a private trial as against the public, whose interests are equally involved in the judicious administration of justice according to law."

Additionally, in the body of the opinion, the court stated:

"The community is deeply interested in the right to observe the administration of justice, and the presence of its members at a public

The limited nature of the decision in that case is succinctly stated in paragraphs six and seven of the syllabus, which provide:

"A judge, in the exercise of his complete control of a criminal proceeding, may exclude those whose conduct is of a disturbing nature, or whose presence is likely to inter- fere with the administration of justice, and may also make such orders of exclusion as will protect public health, morals and safety; but within these limitations, it is his duty to afford both the state and the defendant a public trial in open court.

"Where the sole ground for total exclusion of the public from a pandering trial is the request of defendants and is based entirely on a claim that such defendants might thereby be able to compel a witness for the state to tell their version of the truth on cross-examination, the exclusion of the public is without legal foundation, and a judge will be prohibited from enforcing such order."

It is readily apparent, therefore, that the court in *Fulton* did not view the right to a public trial, so far as the public and the press are concerned, as an absolute right. Rather, the court recognized that such a right is conditional, and may be abrogated in certain circumstances. *Fulton*, at page 168, also recognized that the rights of the press in this regard "rise no higher, and by the same token can be no less, than the rights of any other member of the public." See *Pell* v. *Procunier* (1974), 417 U. S. 817; *Saxbe* v. *Washington Post. Co.* (1974), 417 U. S. 843; and *Allegrezza* v. *Superior Court of Alameda County* (Cal. App. 1975), 121 Cal. Rptr. 245, 47 Cal. App. 3d 952.

The above deduction applies with equal force to re-

trial is as basic as that of a defendant, whether such right be provided for in the Constitution or otherwise." 100 Ohio App. at 161.

The court said further, at page 162, that:

"It can never be claimed that in a democratic society the public has no interest in or does not have the right to observe the administra- tion of justice. The open courtroom is as necessary and important in the interest of supporting the administration of justice as in the pro- tection of the rights of a member of the public when on trial for a criminal offense."

lator's contention that public access to all judicial proceedings must be preserved so that the public may scrutinize the conduct of its government officials. Although we agree that this contention aptly states the general rule, we do not agree that the asserted right is absolute in all contexts. Instead, we believe the reasons for sustaining exclusion of the public and the press from the courtroom in the trial setting apply with even more potent force to pretrial hearings conducted in a widely publicized criminal case in close proximity to the scheduled trial.

With respect to Section 16, Article I of the Ohio Constitution, which begins "[a]ll courts shall be open * * *," we reject relator's assertion that the provision mandates that *all* judicial proceedings be open to the public and the media. We construe Section 16, Article I, as providing all persons with a forum in which legal rights may be preserved or vindicated. As such, the right of each person in this state to due process of law through judicial resolution is secured. Moreover, we would have to unduly stretch the plain language of Section 16, Article I to reach the result asserted by relator.[24] This we are unwilling to do.

Accordingly, we believe that Section 16, Article I of the Ohio Constitution, either standing alone or considered in conjunction with Section 10, Article I of the Ohio Constitution, does not confer upon the public, generally, or the media, specifically, the right to attend *all* judicial proceedings.

### IV. FAIR TRIAL—FREE PRESS

Before we consider the constitutionality of the exclusionary order involved in this extraordinary review,[25] cer-

---

[24] In this regard we note that Ohio, unlike other jurisdictions, has no statutory or constitutional provision mandating that trials shall be open to the public. Cf. Ariz. Const. 1910, Art. 2, Section 11; Idaho Const. 1889, Art. I, Section 18; Mont. Const. 1889, Art. III, Section 6; Neb. Const. 1875, Art. I, Section 13; Ore. Const. 1857, Art. I, Section 10; S. D. Const. 1889, Art. 6, Section 20; Wash. Const. 1889, Art. I, Section 10.

[25] Within a period of eight days, the instant cause had been presented to the Montgomery County Court of Common Pleas, to the Court of Appeals, for Montgomery County, and to this court. By way

tain preliminary observations should be made in order to precisely define the issue that is, and, perhaps equally important, the issues that are not, presented for decision herein. *The ultimate issue presented by the within cause is whether, in the circumstances of this case, the order of the trial court excluding the public and the press from attendance at a pretrial suppression hearing in a widely publicized criminal case can withstand attack on First Amendment grounds, as a restraint upon the right of the press to gather news.* The right of the press to print information contained within a public record, and, concomitantly, the question of under what circumstances, if at all, a trial court may constitutionally restrain the press from publishing such "public" information is not now before us. Cf. *Cox Broadcasting Corp.* v. *Cohn* (1975), 420 U. S. 469, 43 L. Ed. 2d 328. Neither is any question concerning the constitutionality of a "gag order" or "no-comment" rule preventing the parties, their attorneys, witnesses, court personnel, and the like, from communicating with the press or otherwise commenting upon a pending trial presented by the instant proceeding. Cf. *CBS, Inc.* v. *Young, supra* (522 F. 2d 234); *State, ex rel. Nebraska Press Ass'n.* v. *Stuart* (1975), 194 Neb. 783, 236 N. W. 2d 794, certiorari granted, 46 L. Ed. 2d 401; *In re Oliver* (C. A. 7, 1971), 452 F. 2d 111; *Chase* v. *Robson* (C. A. 7, 1970), 435 F. 2d 1059; *Chicago Council of Lawyers* v. *Bauer* (E. D. Ill. 1974), 371 F. Supp. 689, reversed and remanded, 522 F. 2d 242 (C. A. 7, 1975).

We begin analysis of the instant cause by recognizing that it presents an issue of first impression in this state, although the issue is by no means novel.[3] The Fair

of an alternative writ of prohibition issued on November 12, 1975, this court effectively restrained any chilling effect upon relator's First Amendment rights pending final decision herein.

[3] See, e. g., *State, ex rel. Nebraska Press Ass'n.*, v. *Stuart, supra* (236 N. W. 2d 794); *Allegrezza* v. *Superior Court of Alameda County, supra* (121 Cal. Reptr. 245); *Commonwealth* v. *Jackson* (Mass. App. 1975), 327 N. E. 2d 912. See, also, cases cited in fn. 11, 20-22, supra. See, generally, Stewart, Or of the Press, 26 Hastings L. J. 631 (1975) (hereinafter cited as "Stewart"); Comments Gagging the Press in Criminal Trials, 10 Harv. Civ. Rts.—Civ. Lib. L. R. 608 (1975) (herein-

Trial—Free Press controversy has come before the United States Supreme Court in similar context, in recent years,[27] but has yet to be decided by it.

As early as 1950, Mr. Justice Frankfurter, in an opinion respecting the denial of certiorari, wrote:

"The issues considered by the Court of Appeals bear on some of the basic problems of a democratic society. Freedom of the press, properly conceived, is basic to our constitutional system. Safeguards for the fair administration of criminal justice are enshrined in our Bill of Rights. Respect for both of these indispensable elements of our constitutional system presents some of the most difficult and delicate problems for adjudication when they are before the court for adjudication. * * *

"I have set forth in an appendix the course of recent English decisions dealing with situations in which publications were claimed to have injuriously affected the prosecutions for crime awaiting jury determination. (As to freedom of press in England, see Report of the Royal Commission on the Press, Cmd. No. 7700, and the debate thereon in the House of Commons, July 28, 1949. 467 H. C. Deb. (5th ser.) 2683-2794.) Reference is made to this body of experience merely for the purpose of indicating the kind of questions that would have to be faced were we called upon to pass on the limits that the Fourteenth Amendment places

after cited at "Gagging Press"); The Gag Order, Exclusion and the Press's Right to Information, 39 Albany Law Review 317 (1975); Borcher, Fair Trial and Free Press; Preliminary Hearing—Gateway to Prejudice, 5 Law and Soc. Order 903 (1973); Leefs, Free Press v. Fair Trial: A Constitutional Dichotomy. 20 Loyola L. R. 148 (1973-1974); Warren & Abell, Free Press—Fair Trial: The "Gag Order," A California Aberration, 45 S. Cal. L. Rev. 51 (1972); Dowd, Symposium on a Free Press and a Fair Trial, 11 Vill. L. Rev. 677 (1966), D. Gillmore, Free Press and Fair Trial (1966).

[27]See, e. g., Newspapers, Inc., v. Blackwell (1975), 421 U. S. 997; Times-Picayune Pub. Corp. v. Schulingkamp (1974), 419 U. S. 1301, appeal dismissed as moot, 420 U. S. 985 (1975). At the present time, State, ex rel. Nebraska Press Ass'n, v. Stuart, supra (236 N. W. 2d 794) [Now styled Nebraska Press Assn. v. Stuart] is pending before the Supreme Court.

upon the power of States to safeguard the fair administration of criminal justice by jury trial free from mutilation, or distortion by extraneous influences. These are issues that this Court has not yet adjudicated. It is not to be supposed that by implication it means to adjudicate them by refusing to adjudicate." *Maryland* v. *Baltimore Radio Show, Inc.* (1950), 338 U. S. 912, 919.

In *Irvin* v. *Dowd* (1961), 366 U. S. 717, Mr. Justice Frankfurter again recognized the broad issue presently before this court when he stated, at page 730, in a concurring opinion:

"This Court has not yet decided that the fair administration of criminal justice must be subordinated to another safeguard of our constitutional system—freedom of the press, properly conceived. The Court has not yet decided that, while convictions must be reversed and miscarriages of justice result because the minds of jurors or potential jurors were poisoned, the poisoner is constitutionally protected in plying his trade."

In order to place this constitutional issue of great moment in proper perspective, a short review of the constitutional interests herein involved is appropriate.

### IV(A). *FREEDOM OF THE PRESS*

The First Amendment to the United States Constitution states that "Congress shall make no law * * * abridging the freedom of speech, or of the press." Similarly, Section 11, Article I of the Ohio Constitution provides that "no law shall be passed to restrain or abridge the liberty of speech, or of the press." Both freedom of speech and freedom of the press are *fundamental* rights protected by the Due Process Clause of the Fourteenth Amendment from restriction by the states. See *New York Times Co.* v. *Sullivan* (1964) 376 U. S. 254, 277, and cases cited therein.

Although the United States Supreme Court has never clearly distinguished between the guarantees of free speech and free press,[28] it has unmistakably emphasized on numer-

[28]See, *e. g.*, *Branzburg* v. *Hayes, supra* (408 U. S. 665); *Greenbelt Co-operative Publishing Assn.* v. *Bresler* (1970), 398 U. S. 6; *Time, Inc.*,

502

ous occasions the privileged position of the press under the First Amendment.[20]

In *Estes* v. *Texas* (1965), 381 U. S. 532, 539, the court stated: "The free press has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences, including court proceedings."

Maximum freedom of the press has been held necessary in the context of administering criminal justice, because a trial is intended "to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will." *Wood* v. *Georgia* (1962), 370 U. S. 375, 390. See, also, *United States* v. *Dickinson* (C. A. 5, 1972), 465 F. 2d 496, 501.

"A responsible press has always been regarded as the handmaiden of effective judicial administration especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism. This Court has, therefore, been unwilling to place any *direct* limitations on the freedom traditionally exercised by the news media * * *." *Sheppard* v. *Maxwell* (1966), 384 U. S. 333, 350. (Emphasis added.)

Recently, in *Cox Broadcasting Corp.* v. *Cohn, supra* (43 L. Ed. 2d 328), the court noted, at page 347, that

---

v. *Hill* (1967), 385 U. S. 374. See, also, "Gagging Press" and "Stewart," *supra* fn. 26, and Nimmer, Introduction—Is Freedom of the Press a Redundancy: What does it Add to Freedom of Speech? 26 Hastings L. J. 639.

[20]See, *e. g.*, *Cox Broadcasting Corp.* v. *Cohn, supra* (420 U. S. 469); *Miami Herald Publishing Co.* v. *Tornillo* (1974), 418 U. S. 241; *Columbia Broadcasting System* v. *Democratic Natl. Comm.* (1973), 412 U. S. 94; *New York Times Co.* v. *United States* (1971), 403 U. S. 713; *New York Times Co.* v. *Sullivan, supra* (376 U. S. 254). See, generally, "Gagging Press" *supra* fn. 26, at 625-629.

"* * * in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. * * * With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice."

It is clear from the foregoing that the press occupies a privileged and essential position in our hierarchy of democratic self-government. Protecting such position will ensure that the public will receive "suitable access to social, political, esthetic, moral, and other ideas and experiences * * *." *Red Lion Broadcasting Co.* v. *FCC* (1969), 395 U. S. 367, 390.

Despite the foregoing statements, the United States Supreme Court has never regarded the First Amendment guarantees as absolute.[30] For example, not all speech is protected under the ambit of the First Amendment.[31] Moreover, such unprotected expression is not immune from subsequent punishment,[32] nor even from prior restraint in all cases.[33]

Therefore, although it is clear that the freedom enjoined by the press by virtue of the First Amendment represents "one of the great bulwarks of liberty"[34] and, as such, is generally protected even against potential irresponsible

[30]"* * * It has never been held that liberty of speech is absolute. Nor has it been suggested that all previous restraints on speech are invalid. * * *" *Times Film Corp.* v. *Chicago* (1961), 365 U. S. 43, 47.

[31]See *New York Times* v. *Sullivan, supra* (376 U. S. 254); (knowing falsehoods); *Gertz* v. *Robert Welch, Inc.* (1974), 418 U. S. 323 (false statements of fact); *Roth* v. *United States* (1957), 354 U. S. 476 (obscenity); *Chaplinsky* v. *New Hampshire* (1942), 315 U. S. 568 (fighting words).

[32]*Id.*

[33]See *Times Film Corp.* v. *Chicago, supra,* fn. 30; *Near* v. *Minnesota* (1931), 283 U. S. 697.

[34]1 Debates of Congress 451 (1789) (remarks by Mr. Madison).

exercise,[25] it is not so clear that the Constitution requires protection of such freedom at the expense of eroding another fundamental right, that of an accused to a fair trial before an impartial tribunal.[36]

## IV(B). *FAIR TRIAL*

The Sixth Amendment to the United States Constitution provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed * * *." Section 10, Article I,[37] of the Ohio Constitution is of the same effect. By virtue of the Due Process Clause of the Fourteenth Amendment, the Sixth Amendment right to trial by an impartial jury secures to each accused a fair *trial*. See *Cox* v. *Louisiana* (1965), 379 U. S. 559, 562; *Irvin* v. *Dowd, supra* (366 U. S. at 722); *In re Murchison* (1955), 349 U. S. 133, 136.

As stated in *In re Murchison, supra*, "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavor-

---

[35]"A responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated." *Miami Herald Publishing Co.* v. *Tornillo* (1974), 418 U. S. 241, 256. See, also, *New York Times Co.* v. *Sulbivan, supra* (376 U. S. at 271) wherein the court, quoting Mr. Madison, stated: "'Some degree of abuse is inseparable from the proper use of everything; and in no instance is this more true than in that of the press.' 4 Elliott's Debates on the Federal Constitution (1876), p. 571."

[36]O'Neill, C. J., in his opinion, adheres to the absolutist view of the protections afforded by the First Amendment. Although this view has been vigorously advocated by such preeminent judicial scholars as Mr. Justice Black and Mr. Justice Douglas (see *New York Times Co.* v. *United States* [1971], 403 U. S. 713, 720 [Douglas, J., concurring] and cases cited at fn. 1 therein), it has *never* been endorsed by a majority of the Supreme Court of the United States as the law of the land. Accordingly, the entire tenor of his opinion must be viewed with a discerning eye, as any opinion can only be as strong as its supporting reasons.

[37]See fn. 13, *supra*.

ed to prevent even the probability of unfairness. * * * [T]o perform its high function in the best way 'justice must satisfy the appearance of justice.' *Offutt* v. *United States*, 348 U. S. 11, 14.'' See, also, *Estes* v. *Texas, supra* (381 U. S. at 543).

Nearly 70 years ago Mr. Justice Holmes, in *Patterson* v. *Colorado* (1907), 205 U. S. 454, 462, expressed what has become the starting point utilized by appellate courts in examining the fairness of a particular trial:

''The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.'' See, also, *Sheppard* v. *Maxwell, supra* (384 U. S. at 351); and *Marshall* v. *United States* (1959), 360 U. S. 310.

In recent years, the United States Supreme Court has been called upon to examine the fairness of numerous state trials in instances where extensive publicity was alleged to have deprived an accused of due process of law.[38] In each such instance, unlike the instant cause, the trial had already occurred, allowing the court to undertake its analysis blessed with the peripheral vision that hindsight often engenders. In the early cases, *Stroble* (343 U. S. 181) and *Irvin* (366 U. S. 717), the court examined the record in order to determine whether prejudice to the accused resulted from the publicity generated in the community in which the accused stood trial. In *Rideau* (373 U. S. 723), the court broadened the basis for reversal of state court convictions, challenged as denying due process of law because of extensive prejudicial publicity, when it held that certain factual circumstances enveloping the trial environment are prejudicial to an accused. The court utilized the ''inherently prejudicial'' approach in *Turner* (379 U. S.

---

[38]See, *e. g., Murphy* v. *Florida* (1975), 421 U. S. 794, 44 L. Ed. 2d 589; *Sheppard* v. *Maxwell, supra* (384 U. S. 333); *Estes* v. *Texas, supra* (381 U. S. 532); *Rideau* v. *Louisiana* (1963), 373 U. S. 723; *Irvin* v. *Dowd, supra* (366 U. S. 717); *Stroble* v. *California* (1952), 343 U. S. 181.

466), *Estes* (381 U. S. 532) and *Sheppard* (384 U. S. 333). In *Rideau*, the circumstance held to be prejudicial was the televising of an interrogation session in which the accused admitted his guilt. In *Turner*, the fact that two key witnesses for the prosecution were deputy sheriffs who also served as jury "shepherds" during the trial resulted in reversal of the state conviction without a showing of identifiable prejudice. In *Estes*, reversal occurred because the trial of a much publicized financier was televised over his objection. In *Sheppard*, the unsequestered jurors were subjected to media coverage of the trial, described as conducted in a "carnival atmosphere"—a " 'Roman holiday' for the news media," due to the failure of the trial judge to sufficiently control the conduct of the proceedings before him. As a result, Sheppard was deprived of due process of law, and reversal of his conviction was mandated.

In *Murphy* v. *Florida, supra* (421 U. S. 794), the Supreme Court affirmed a state court conviction challenged as tainted by prejudicial publicity. In so doing, the court analyzed its prior decisions dealing with this issue and held that Murphy had failed to demonstrate either inherent prejudice in the trial setting[39] or actual prejudice from the jury-selection process.[40]

In examining the *voir dire* in *Murphy*, the Supreme Court noted that the actual jurors gave their assurances that the cause would be judged impartially. The court then stated:

"Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory, but the circumstances surrounding petitioner's trial are not at all of that variety * * * the news articles concerning petitioner had appeared almost entirely during the period between December 1967 and January 1969, the latter date being seven months before the jury in this case was selected * * *

---

[39] *Rideau* v. *Louisiana*; *Estes* v. *Texas*; and *Sheppard* v. *Maxwell, supra* fn. 38.

[40] *Irvin* v. *Dowd, supra* fn. 38.

[t]hey were, moreover, largely factual in nature. Compare *Beck* v. *Washington*, 369 U. S 541 * * * (1962), with *Sheppard* v. *Maxwell, supra.*'' 44 L. Ed. 2d at 596. See, also, *Calley* v. *Calloway* (C. A. 5, 1975), 519 F. 2d 184.

Analysis of the cases discussed above reveals that the Supreme Court engages in an *ad hoc* examination of the totality of circumstances comprising the environment in which a state trial occurred in order to determine whether ''a fair trial in a fair tribunal'' inured to each accused.[41]

In each case, the court stressed the importance of the right to a fair trial in the overall scheme of fundamental freedoms bestowed upon each citizen as his birthright. Viewed against this background, then, it hardly needs to be stated that the right to a fair trial is, as Mr. Justice Clark stated,[42] ''the most fundamental of all freedoms.''

IV(C) *FAIR TRIAL* v. *FREE PRESS*

Mindful of the numerous authorities referred to herein in Parts IV(A) and (B) of this opinion, we are acutely aware that ''free speech and fair trials are two of the most cherished policies of our civilization, and it would be [is] a trying task to choose between them.'' *Bridges* v. *California* (1941), 314 U. S. 252, 260. As stated by the court in *United States* v. *Dickinson, supra* (465 F. 2d 496, at 502):
''* * * The balance is delicate with so much at stake, and the equipollence of the interests defies a simple resolution by mere judicial tug-of-war, with the 'lesser' bantam liber-

----

[41]Chief Justice O'Neill's reliance upon *Sheppard* v. *Maxwell, Irvin* v. *Dowd,* and *Murphy* v. *Florida* (fn. 38) is misplaced. The quotation he relies upon in *Sheppard* concerning the responsibilities of a trial judge in heavily publicized cases is pure *dictum,* and too much has already been made of the implications and ramifications of that part of the *Sheppard* opinion to require further comment herein. It is sufficient to say that the Supreme Court of the United States was not presented with the concise legal issue involved in the cause at bar in any of the aforesaid cases upon which O'Neill, C. J., so heavily relies in his opinion. To the extent that *Sheppard, Irvin,* and *Murphy* discuss change of venue as a procedure to be used by a trial court to avert a denial of a fair trial and due process of law, those cases are relevant, however, and will be discussed in more detail in fn. 68, *infra.*

[42]*Estes* v. *Texas, supra* (381 U. S. at 540).

ty giving way to a weightier, more Herculean one."

We acknowledge that "[a] *trial* is a public event. What transpires in the courtroom is public property. * * * Those who see and hear what transpired may report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it." (Emphasis added.) *Craig* v. *Harney* (1947), 331 U. S. 367, 374   See, also, *Stroble* v. *California, supra* (343 U. S. at 193); *Estes* v. *Texas, supra* (381 U. S. at 541); *Sheppard* v. *Maxwell, supra* (384 U. S. at 350).

On the other hand, "* * * [l]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges* v. *California, supra* (314 U. S. at 271).

In the case at hand, the respondent judge entered an order effectively excluding "the public" from attendance at all pretrial suppression hearings in the case of *State* v. *Moore.* He premised his order on the basis that the intense publicity surrounding the forthcoming trial of defendant Moore "has created a clear and present danger of serious and imminent threat to the administration of justice * * * which might affect the right of the defendant to a fair and impartial trial."

At the outset, we must determine whether exclusion of the public and the press from a pretrial suppression hearing in a criminal case constitutes a "prior restraint" upon publication by the press.  Prior restraints are not per se unconstitutional, but to be sustained each such prior restraint must overcome a heavy presumption against its constitutional validity.  *Organization for a Better Austin* v. *Keefe* (1971), 402 U S. 415; *New York Times Co.* v. *United States* (1971), 403 U. S. 713.  Although the phrase "prior restraint" has achieved a meaning of its own over the years, we deem it appropriate to recall Mr. Justice Frankfurter's warning that such phrase not be deemed a "self-wielding sword" or a "talismanic test." *Kingsley*

*Books, Inc.* v. *Brown* (1957), 354 U. S. 436. The instant cause presents an appropriate situation in which the meaning behind the phrase should be examined.

Admittedly, the order presented herein for review is similar in effect to the end result caused by imposition of a traditional prior restraint. Relator, without access to the pretrial hearing, will be unable to publish reports concerning the proceedings conducted therein. In this regard, the respondent's order does indeed inhibit the relator's ability to gather newsworthy material with a view towards dissemination of same.

On the other hand, we are constrained to point out that traditional prior restraint cases involved predetermined judicial prohibitions restraining specific expressions or materials. See, *e. g., New York Times Co.* v. *United States, supra* (403 U. S. 713); *Near* v. *Minnesota* (1931), 283 U. S. 697; *Nebraska Press Assn.* v. *Stuart, supra* (46 L. Ed. 2d 401) (argued April 19, 1976, and awaiting decision). In this context, the media is restrained from disseminating through publication information that it already has in its possession. In the instant case, however, no such direct restraint is imposed, as the media will have no further potentially damaging information to publish. The distinction between the prior restraint cases and the case at bar is thus apparent: although the Constitution, except in limited circumstances,[43] absolutely protects the right of the press to publish such information as it possesses, the protection afforded by the Constitution to the concomitant right of the press to gather news for the purpose of publication is not nearly so pervasive. *Branzburg* v. *Hayes, supra* (408 U. S. 665); *Pell* v. *Procunier, supra* (417 U. S. 817). We consider such distinction crucial, and conclude that the

---

[43]See, *e. g.,* cases cited in fn. 33, *supra.* It also bears notation that the Supreme Court of the United States, in *Nebraska Press Assn.* v. *Stuart, supra* fn. 27, will have to decide whether imposition of a "gag order" restraining the press for publishing certain specific information prior to a criminal trial may be upheld as another exception to the prohibition of the prior restraint doctrine.

prior restraint doctrine has no application to the instant cause.

Rejection of the prior restraint doctrine as inapplicable in the circumstances herein presented does not end our analysis; quite the contrary, it merely provides a point of demarcation from which we must consider the constitutionality of the respondent's order.

Respondent maintains that the evidence adduced at the hearing upon the motion to conduct all pretrial suppression hearings *in camera* revealed that a "clear and present danger of a serious and imminent threat to the administration of justice" existed due to extensive pretrial publicity permeating the potential trial environment, and polluting the minds of prospective jurors with "facts" generally inadmissible at trial.

Respondent has appropriated the "clear and present danger" language first utilized by Mr. Justice Holmes in *Schenck* v. *United States* (1919), 249 U. S. 47, as a rule of evidence to limit the time and place, but not the content, for exercise of freedom of speech, and applied it as the yardstick by which two apparently competing fundamental rights could be measured and balanced. In the years following *Schenck*, the Supreme Court used the "clear and present danger" test to measure instances when necessary information could be restrained or suppressed for the sake of a higher public interest. For example, in *Herndon* v. *Lowry* (1937), 301 U. S. 242, the court struck down a Georgia insurrection statute on the ground that the defendant's conduct did not rise to the level of a clear and present danger of causing the substantive evil that the statute was purportedly enacted to prevent.

The clear and present danger test soon became one of the court's favorite analytical catch phrases, and was used in other related First Amendment problems,[4] as well as in

---

[4]See, *e. g., Thomas* v. *Collins* (1945), 323 U. S. 516 (registration of labor organizers); *West Virginia State Bd. of Educ.* v. *Barnette* (1943), 319 U. S. 624 (compulsory flag salute for public school children); *Cantwell* v. *Connecticut* (1940), 310 U. S. 296 (disturbing the

the pure speech context. Eventually, however, resistance to use of the test as a panacean measure eroded its posteric value. In *Dennis* v. *United States* (1951), 341 U. S. 494, a plurality of the court concluded that use of the clear and present danger test would preclude governmental action until the harm had already occurred. Therefore, the *Dennis* plurality modified the test by adopting the formulation offered by Chief Judge Learned Hand in his opinion below: "In each case * * * [courts] must ask whether the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." 183 F. 2d at 212.

The clear and present danger test then lay dormant in the years following *Dennis,* and was in fact used in only one majority opinion during the time of the Warren court. In *Wood* v. *Georgia* (1962), 370 U. S. 375, the court used the test to reverse a contempt conviction premised upon statements allegedly made to interfere with the administration of justice. *Wood* was the last of a line of contempt cases in which the "clear and present danger" test was used, although each such case stated the test in somewhat different terms.[45] Analysis of the contempt cases makes clear that the

peace); and *Thornhill* v. *Alabama* (1940), 310 U. S. 88 (picketing in labor disputes). See, also, Engelman, First Amendment Prospective. The Gag Rule and Free Speech. 51 Chicago-Kent Law Review 597, 605 (1974).

[45]In *Bridges* v. *California* (1941), 314 U. S. 252, the court, in commenting upon the "clear and present danger" test, stated: "What finally emerges from the 'clear and present danger cases' is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished." 314 U. S. at 263.

In *Pennekamp* v. *Florida* (1946), 328 U. S. 331, 336, the court characterized the test as follows: "Whether the threat to the impartial and orderly administration of justice must be a clear and present or a grave and immediate danger, a real and substantial threat, one which is close and direct or one which disturbs the court's sense of fairness depends upon a choice of words. Under any one of the phrases, reviewing courts are brought in cases of this type to appraise the comment on a balance between the desirability of free discussion and the

512

court modified the "clear and present danger" language to include the concepts of imminence and seriousness in its formulation of the applicable test. In this regard, the court evidenced its intention to closely examine the record in each case to ascertain whether the facts warrant punishment for contempt in light of the high standard that must be surmounted due to the First Amendment freedoms involved.

The problem presented by potentially prejudicial pretrial publicity in the fair trial context has been reviewed many times since the vanguard case of *Sheppard* v. *Maxwell*, *supra* (384 U. S. 333).[40] The Supreme Court, in *Sheppard*, at page 363, invited courts to "take such steps by rule and regulation that will protect their processes from prejudicial outside interferences." Such action is necessary because

necessity for fair adjudication, free from interruption of its processes."

In *Craig* v. *Harney* (1947), 331 U. S. 367, the court stated that "[t]he vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute an imminent, not merely a likely threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil." 331 U. S. at 376.

In *Wood* v. *Georgia,* *supra,* the court did not further refine or explain the meaning of the "clear and present danger" test. Rather, after quoting excerpts from *Bridges, Pennekamp* and *Craig, supra,* the court simply stated that "[i]t is with these principles in mind that we consider the case before us." 370 U. S. at 385.

[40] See, *e. g.,* Recommended Court Procedure to Accommodate Rights of Fair Trial and Free Press (ABA Advisory Committee on Fair Trial and Free Press) (November 1975); Report of the Committee on the Operation of the Jury System on the "Free Press—Fair Trial" Issue, 45 F. R. D. 391 (1968) ("Kaufman Report"); Freedom of the Press and Fair Trial: Final Report with Recommendations by the Special Committee on Radio, Television, and the Administration of Justice of the Association of the Bar of the City of New York (Columbia University Press, 1967) ("Medina Committee"); American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press (Approved Draft, 1968) ("Reardon Committee"). See, generally, "Gagging Press," *supra,* fn. 26; Fair Trial and Free Press: A Due Process Proposal. Landau, The Challenge of the Communications Media, 62 A.B.A.J. 55 ("Landau"); and Roney, The Bar Answers the Challenge, 62 A.B.A.J. 60 (1976).

"reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception." *Id.*

The American Bar Association, in 1968, approved the following draft relating to the conduct of pretrial proceedings in criminal cases:

"3.1 Pretrial hearings.

"It is recommended that the following rule be adopted in each jurisdiction by the appropriate court:

"Motion to exclude public from all or part of pretrial hearing.

"In any preliminary hearing, bail hearing, or other pretrial hearing in a criminal case, including a motion to suppress evidence, the defendant may move that all or part of the hearing be held in chambers or otherwise closed to the public, including representatives of the news media, on the ground that dissemination of evidence or argument adduced at the hearing may disclose matters that will be inadmissible in evidence at the trial and is therefore *likely to interfere* with his right to a fair trial by an impartial jury. *The motion shall be granted unless the presiding officer determines that there is no substantial likelihood of such interference.* With the consent of the defendant, the presiding officer may take such action on his own motion or at the suggestion of the prosecution. Whenever under this rule all or part of any pretrial hearing is held in chambers or otherwise closed to the public, a complete record of the proceedings shall be kept and shall be made available to the public following the completion of trial or disposition of the case without trial. Nothing in this rule is intended to interfere with the power of the presiding officer in any pretrial hearing to caution those present that dissemination of certain information by any means of public communication may jeopardize the right to a fair trial by an impartial jury.'" (Emphasis added.)

We consider the above draft an admirable effort at

---

[47]"Reardon Committee," *supra,* at 7-8.

514

reconciling the recently competing interests of what has been loosely labeled as "Fair Trial Versus Free Press."

However, we find that the emphasized language of the standard too lightly dismisses the substantial First Amendment interest of the media, and, as a consequence thereof, poses a serious threat to potential erosion of our cherished First Amendment freedoms.

Standard 3.1 adopts the "substantial likelihood" test, and, additionally, seems to create a presumption that each defense motion to close the courtroom should be granted unless no substantial likelihood of interference with the defendant's right to a fair trial is found to exist.

Although we are aware that at least two courts[48] have adopted a test similar to that recommended by Standard 3.1, we are not persuaded by the rationale urged as support for the "substantial likelihood" standard.

In the recent case of *Chicago Council of Lawyers* v. *Bauer* (C. A. 7, 1975), 522 F. 2d 242, the court reversed the decision of the district court in which the "reasonable likelihood" standard was adopted. *Bauer* began as a declaratory judgment action challenging the constitutionality of local federal court rules restricting attorney comment on pending criminal cases. The circuit court, in *Bauer,* concluded that "[o]nly those comments that pose a 'serious and imminent threat' of interference with the fair administration of justice can be constitutionally proscribed." 522 F. 2d at 249. Although the "no-comment" issue presented in *Bauer*, as the court recognized,[49] more closely lends itself to traditional "prior restraint" analysis and, therefore,

---

[48]The test was characterized as permitting restraint if a "reasonable likelihood" of interference with a fair trial was shown in *United States* v. *Tijerina* (C. A. 10, 1969), 412 F. 2d 661 certiorari denied, 396 U. S. 990; *Chicago Counsel of Lawyers* v. *Bauer* (E. D. Ill. 1974), 371 F. Supp. 689, reversed and remanded, 522 F. 2d 242 (C. A. 7, 1975).

[49]"The conclusion we reach from this analysis is that we cannot label the no-comment rules as 'prior restraints' given the connotations of that term, but we do recognize that these rules have some of the inherent features of 'prior restraints' which have caused the judiciary to review them with particular care." 522 F. 2d at 248-249.

is distinguishable from the instant cause, we believe the "serious and imminent threat" test adopted by the court therein is in accord with the analysis utilized by the Supreme Court in the contempt cases,[50] and is equally applicable to the instant controversy.

Upon the foregoing review of authorities, we conclude that in order to ensure that "[f]reedom of discussion [will] be given the widest range compatible with the essential requirement of the fair and orderly administration of justice,"[51] a trial court should closely scrutinize the evidence and testimony presented in support of each defense motion[52] requesting that all or a part of judicial procedure in any such case be closed to the public and the media, and in so doing would apply the following test:

*The motion to close the courtroom in any way for any purpose should be denied unless: The defendant proves that a serious and imminent threat to the fair administration of justice exists which, upon balance, outweighs the particular First Amendment interest asserted.*

In applying the "serious and imminent threat" test, a trial court should consider the totality of the circumstances comprising the environment in which the eventual trial will take place. In this regard, such factors as the extent of publicity, the content of articles published, and the time frame of articles vis a vis the scheduled trial date should be closely examined. With respect to the contents of articles published, particular attention should be given to confessions, prior criminal records and other matters, the admissibility of which is in doubt. Disclosure of such matters prior to trial has resulted in reversal upon appeal. See, *e. g., Rideau* v. *Louisiana, supra* (373 U. S. 723). Since such information

---

[50]In this regard it is important to note that none of the four contempt cases, *Wood, Craig, Pennekamp,* or *Bridges* discussed previously herein were tried by a jury. See fn. 45 *supra.*

[51]*Pennekamp* v. *Florida, supra* (328 U. S. at 347).

[52]Section 10, Article I of the Ohio Constitution provides each accused with the *right* to a public trial. We assume, without deciding, that the defendant's waiver of such right is a prerequisite to any order closing the courtroom.

is generally held inadmissible at trial, a significant threat is presented that the truism "conclusions to be reached in a case will be induced only by evidence and argument in open court" [*Patterson* v. *Colorado, supra* (205 U. S. at 462)] may unwittingly be reduced to a half-truth at the expense of maintaining the integrity of our judicial process and safeguarding the fundamental right of each accused to a fair trial before an impartial tribunal unless the trial court proceeds with caution and awareness in all heavily publicized cases. We do not mean to imply that orders closing the courtroom should become the rule, rather than the exception, in all sensational cases. We only indicate the seriousness of the First and Sixth Amendment rights involved in such cases, and urge the trial courts of this state to approach each such matter with awareness and caution, remembering the strictures of the test heretofore elucidated in passing upon a defense motion requesting exclusion of the public and the press from the courtroom.

It is appropriate, here, to examine the record to determine whether the finding of "a clear and present danger of serious and imminent threat to the administration of justice" should be sustained.[53]

Examination of the record reveals that relator left no stone unturned in developing the Emoff kidnap-murder into a major subject of community discussion. Various articles were devoted to recitation of the known facts concerning the *modus operandi* of the kidnap and subsequent murder. Other articles described the investigations being undertaken by both the Dayton Police Force and the Federal Bureau of Investigation. The human-interest aspect of this case was exploited at great length through numerous articles, based upon interviews with relatives and

---

[53]From September 24 through November 4, 1975, a period of 42 days, over 75 articles touching upon nearly every facet of this controversial case appeared in the Dayton newspapers. These articles were attached as exhibits to the amicus brief filed on behalf of defendant Moore in this court, and were considered by the respondent, Judge Phillips, prior to issuance of the order now under attack.

friends of the deceased, detailing the slain man's fine character and exemplary lifestyle. Most importantly, however, the relator devoted a considerable amount of ink and space to articles highlighting the criminal background of each codefendant as well as to articles revealing the posture of court proceedings in the case.

In this regard, the following excerpts from newspaper accounts focusing upon this case bear examination.

In the Thursday, October 2, 1975, edition of the Dayton Daily News appeared the following paragraphs:

"It also has been learned that Scott [on] Wednesday failed to pass a lie detector test to determine if he had told investigators the truth that he was involved in the kidnapping but had no knowledge that Emoff would be killed and had no role in the slaying.

"The polygraph test, which will not be admissible as evidence in court was administered Wednesday afternoon at the Dayton police department.

"* * *

"In a related development, Brogan disclosed he has asked the Montgomery county sheriff's office to investigate the source of a story in the Dayton News Tuesday reporting details of Emoff's final moments. [Brogan is the prosecutor.]

"Brogan and a number of others involved in the investigation accused The Daily News of displaying poor taste when it reported that Emoff had begged his kidnappers for mercy before being shot seven times.

"Brogan said investigators want to know how the newspaper obtained the information, which he said stemmed from a statement given investigators by one of the suspects in the case."

Excerpts relating to the "lie detector" aspect of this case also appeared in the October 3rd and 4th editions of the Journal Herald.

On September 29, 1975, the spectre of conspiracy was raised by a Journal Herald article entitled "Did 3 suspects know each other as cons?" In the same article, the criminal

past of defendant Moore was disclosed, claiming that "Moore is believed by investigators to be the same man who was identified in newspaper clippings as convicted in 1948 for a torture robbery of a local couple and in 1954 for an armed robbery at a local store." To further illustrate the criminal behavioral tendencies allegedly displayed by Moore, this same article disclosed that "[a]ccording to the newspapers, Moore tried to commit suicide in the Montgomery County jail in 1954 by drinking disinfectant."

The September 27, 1975, edition of the Journal Herald contained an article detailing codefendant Scott's extensive prior criminal record.

Both papers revealed, on September 30, 1975, that codefendant Scott admitted his role in the kidnap-murder and gave police details of the crime. The Journal Herald article also reported that Scott attributed the actual abduction to the actions of codefendants Leroy and Moore.

Most seriously damaging to the defendant's chance to receive a fair trial was a series of articles appearing in both papers disclosing that the defendant was expected to file motions "aimed at suppressing evidence against the men * * * includ[ing] statements given by at least two of the suspects to the FBI."[54] In this regard, the November 5, 1975, edition of the Journal Herald reported that "[a]ttorneys are especially fearful of a public hearing on a statement that defendant Herman Lee Moore gave to police in which he allegedly implicated himself and the other two defendants," while the Dayton Daily News, on October 28, 1975, disclosed that "[a]ttorneys for a defendant in the Lester C. Emoff kidnap-murder case today asked that pretrial hearings which will challenge the admissibility of evidence in the case, including a confession, be closed to the public."

Even a cursory review of the above excerpts[55] reveals

---

[54]October 23, 1975, edition of the Dayton Daily News.

[55]The observation of Stern, J., in his opinion, that "it is important to note that this [news] coverage was exclusively factual and objective" and that "[t]he descriptions of the defendants and their backgrounds were equally objective" is indefensible. What is "factual" or

that such highly incriminating matters as the three accuseds' prior criminal records, Scott's failure to pass a lie detector test, and both Moore and Scott's alleged confessions were released by the relator in the very community in which these accuseds have a right to stand trial for their lives.[56] In this regard, it may be noted that, in Ohio, the results of a lie detector test are generally inadmissible in evidence at a criminal trial (*State v. Towns* [1973], 35 Ohio App. 2d 237; *State v. Hegel* [1964], 9 Ohio App. 2d 12; *State v. Hill* [1963], 40 Ohio App. 2d 16; Annotation 23 A. L. R. 2d 1308), and prior criminal conduct of an accused may be introduced only in extremely limited circumstances (*State v. Curry* [1975], 43 Ohio St. 2d 66; *State v. Cox* [1975], 42 Ohio St. 2d 200; *State v. Burson* [1974], 38 Ohio St. 2d 157; *State v. Flonnory* [1972], 31 Ohio St. 2d 124). Moreover, the alleged confessions were yet to be determined admissible, having been challenged by the defendants as obtained by the police in violation of their constitutional rights, especially the Sixth Amendment right to the assistance of counsel.

As if the above events were not enough to constitute a "serious and imminent threat" to the administration of justice, community attention was further focused on the Emoff case when WHIO Television and relator Dayton Daily News engaged in a verbal battle over which media had been more irresponsible and/or incompetent in its respective treatment of the case.

"objective" about reporting that *"Moore is believed by investigators to be* the same man who was * * * convicted in 1948 for a torture robbery of a local couple" or about reporting that Moore "allegedly" implicated himself in the slaying by way of a confession, prior to any adjudication of the admissibility of such a confession? (Emphasis added.) Objective reporting occurs through a balanced discussion of all salient facts and circumstances involved in a particular matter of news interest. Such a balanced approach, to be truly objective in this case, must, of necessity, consider the rights of the accused. It is obvious from analysis of the quoted excerpts from the two Dayton daily newspapers that no such objectivity, factual or otherwise, was attained with respect to the case of *State v. Moore.*

[56]Section 10, Article I of the Ohio Constitution. See fn. 13, *supra.*

The battle began with a volley fired by Jack Hurley, Community Service and Editorial Director of WHIO, expressing "an opinion of the management," which stated:

"The very term 'gag order' is enough to make most of the news media 'gag'.

"Montgomery County Common Pleas Court Judge Stanley Phillips has issued a 'gag order' which applies to law enforcement officers, investigators and attorneys involved in the handling of the Lester Emoff kidnap/murder case. Judge Phillips expressed concern that excessive pre-trial publicity might prejudice the case against the accused.

"The Judge's initial order was a blanket one that banned all interviews and press releases. It was later modified considerably and limited to matters of detailed evidence that the Judge fears might hamper the defendants [sic] rights to a fair trial. In light of the actions of the Dayton Daily News, the Judge had little choice but to take action.

"A number of things are worth considering. First, the situation would not have occurred if investigators or investigative sources hadn't talked 'out of school' in a manner that could conceivably prejudice the case. Second, the conflict between the right to a fair trial and freedom of the press is a complex one but one that can be resolved by reasonable and fair-minded persons in the media and the courts. And thirdly, there wouldn't be a need for a 'gag order' of any kind if the Dayton Daily News had used some of the common sense, responsibility and ethics it almost daily demands of other people in the public sector.

"There is no reasonable or desirable alternative to a free press in this country, but that fact does not free the media from responsibility for its actions.

"Just as 'gag orders' make us 'gag' . . . so does the blatant irresponsibility of the Dayton Daily News."

Subsequently, in order to comply with its duty to present opposing viewpoints on controversial issues of the day, WHIO gave broadcast time to James Dygert, City Editor of the Dayton Daily News, who retorted:

"A WHIO editorial recently tried to accuse The Day-

ton Daily News of journalistic irresponsibility for its reporting of the facts in the Lester Emoff kidnapping-murder.

"WHIO and Jack Hurley, the announcer who read the editorial, obviously couldn't tell a journalistic principle from an avocado, but never mind. The right of the people to know what is going on in their community needs to be defended against such uninformed attacks, even more than against intelligent ones.

"The editorial had to do with The Daily News' reporting that one of the accused had failed a lie-detector test. Lie-detector tests often are inadmiss[i]ble in evidence, and Judge Stanley Phillips subsequently issued an order seeking to prevent law-enforcement and court officials from giving out such information.

"The judge then narrowed his order to minimize the damage to public understanding. He was responding to his duty as he saw it, just as responsible journalistic agencies were responding to their duty to ferret out and publish the truth. If newsmen reported only what can go into court records, the public would have little defense against abuses in the criminal justice system.

"Television news presentation has come of age in much of the country. In many cities it now is a valuable civic asset. Unfortunately, not so with WHIO. The staff of Channel 7 is baffled when trying to report anything it can't take a picture of. Hurley's pathetic efforts at commentary are only one result. WHIO has not demonstrated enough journalistic competence to qualify for making judgments on others. The real victim of all this is the Dayton Community, which deserves professional newscasting, but is not getting it on this channel."

Little need be said concerning the impact of such an unusual state of affairs upon prospective jurors in Montgomery County as that engendered by the fractionalized media reporting of the Emoff case. Few techniques could be conceived that would serve to focus more attention upon a particular issue than public awareness that the two separate purveyors of newsworthy items, the print and the electronic

media, are at war with each other over reportorial ethics.[57]

Upon examination of the more than 75 newspaper articles, we conclude that a "serious and imminent threat" to defendant Moore's constitutional right to a fair trial was shown to exist. In this regard we reiterate that many articles contained information generally inadmissible at trial (results of codefendant's lie detector test and the prior criminal record of Moore), as well as other highly incriminating evidence, the admissibility of which had yet to be determined (statements/confessions of Moore and Scott).[58]

---

[57] In his opinion, Stern, J., makes the statement that "some of the publicity took the form of a squabble between a newspaper and a TV station as to which media had been more scrupulous in respecting the defendants' rights." This writer feels that nothing could be further from the truth, but leaves that judgment to be made by the reader, as the editorials are reproduced herein verbatim.

[58] Both O'Neill, C. J., and Stern, J., conclude that insufficient evidence was presented to the trial court to sustain its ruling. O'Neill, C. J., makes the sweeping statement that "there is no reason for a trial court to be called upon to draw a speculative conclusion that there will be prejudicial publicity emanating from a future courtroom hearing on the motions to suppress evidence and to presume that such publicity will create a clear and present danger of serious and imminent threat to the administration of justice and, based on that speculation and presumption, to order the public barred and the press excluded from the hearing, thereby abridging the freedom of the press which is for the benefit of the public." There is nothing "speculative" about the nature of the issues to be presented at the pretrial hearing—the issues concern the suppression of evidence, including a confession, allegedly obtained in violation of the defendant's constitutional rights. In light of the fact that nearly two articles per day were printed concerning the *Moore* case from the date of the abduction to the date of the order under review, not to mention the pervasive television coverage enveloping the case, Judge Phillips certainly did not need a "crystal ball" to aid his "speculation" as to the manner in which the news media would handle further revelations concerning the case. With regard to the effect of such "speculative" publicity upon prospective jurors, we adhere to the established principle of constitutional law that "our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison, supra* (349 U. S. at 136). In our view, the trial court's order was well supported by convincing evidence, both

Such information was disseminated to prospective jurors only weeks maybe even days, prior to the scheduled start of Moore's trial.[59] Cf. *Murphy* v. *Florida*

qualitative and quantitative, and was not premised upon the quicksand of "speculation" as suggested by O'Neill, C. J., in his opinion.

[59] In Ohio, each person charged with a crime and not released upon bail must be brought to trial within 90 days after his arrest. See R. C. 2945.71. Although this rule is subject to certain specified exceptions, see R. C. 2945.72, upon which we defer ruling at this time, the mere existence of such a speedy trial statute serves to negate the possibility that time will render what might have constituted prejudicial publicity harmless.

Although Stern, J., suggests that a continuance could be granted pursuant to R. C. 2945.72 in order to permit the publicity to subside, no motion for continuance was requested in this cause by the defendant, nor was a continuance granted by the trial court. Accordingly, the suggestion offered by Stern, J., as to his construction of R. C. 2945.72 amounts to nothing more than an advisory opinion expressing his *personal* views on an issue not relevant to the disposition of the instant cause.

While not intending to state by complete views upon the construction Stern, J., affords to R. C. 2945.72, I cannot resist the temptation to respond, as devil's advocate, to his assertions.

Stern, J., maintains that R. C. 2945.72(E), (F), and (G), under the facts of this case, provide a mechanism for extension of the 90-day rule mandated by R. C. 2945.71.

With respect to R. C. 2945.72(E), which concerns extension of the statutory time by reason of a motion made by the defendant, let us pause to remember that the motion made by the defendant in this case, to hold all pretrial suppression hearings *in camera*, was decided by the trial court in the defendant's favor well within the statutory time limit. Any period of delay beyond the time prescribed by R. C. 2945.71 can arguably be attributed to the relator herein, Dayton Newspapers, Inc., and *not* to the defendant.

R. C. 2945.72(F) permits extension of the R. C. 2945.71 time limit due to "[a]ny period of delay necessitated by a removal or change of venue pursuant to law." Since no such action has yet occurred in this cause, how can that subsection support a continuance?

Finally, R. C. 2945.72(H) tolls the R. C. 2945.71 time period due to "[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion." The defendant did not move for a continuance of his trial; therefore the first part of subsection (H) does not apply. It is apparent that R. C. 2945.71 and 2945.-72 were enacted to ensure that all persons indicted for

(421 U. S. 794); *Beck* v. *Washington, supra* (361 U. S. 541); *Calley* v. *Calloway, supra* (519 F. 2d 184). Moreover, and perhaps most importantly, in the absence of respondent's order, relator would be able to attend Moore's pretrial suppression hearing and report the evidence adduced therein with impunity. *Sheppard* v. *Maxwell, supra* (384 U. S. 333). Publication of such incriminating evidence, especially if that evidence is subsequently ruled inadmissible at trial, cannot help but seriously poison the minds of the Dayton community from which Moore's prospective jurors will be selected.

In reaching such conclusion, we distinguish immediately the instant cause from all public trial cases,[60] for what is involved herein is not the trial phase of litigation, but rather the *pretrial stage of a sensationalized case on the verge of trial.* In the trial phase of litigation other alternatives are available to a trial judge to prevent publication of prejudicial material from reaching the ears and minds of the actual jurors. We refer, of course, to sequestration of the jury, voir dire,[61] and change of venue. The

criminal offenses in this state receive the "speedy trial" guaranteed them by both the federal and Ohio Constitutions. If a defendant demands an immediate trial, or does not otherwise seek to acquiesce in a period of delay beyond that permitted by statute, R. C. 2945.72(H) should not be utilized to frustrate exercise of a defendant's constitutional right to a speedy trial. Although "the right to a speedy trial is unique in its uncertainty as to when and under what circumstances it must be asserted or may be deemed waived * * * the primary burden [is] on the courts and the prosecutors to assure that cases are brought to trial." *Barker* v. *Wingo* (1972), 407 U. S. 514, 529.

To this writer, at least, upholding the constitutionality of R. C. 2945.72(H) may pose a difficult problem under certain circumstances. For this reason, Justice Stern's unnecessary construction of R. C. 2945.72(H) in the context of the present case should be reduced to what it really is: an advisory opinion expressing the personal viewpoint of *only* the writer thereof.

[60]*United States, ex rel. Bennett,* v. *Rundle, supra,* 419 F. 2d 599; *Lewis* v. *Peyton* (C. A. 4, 1965), 352 F. 2d 791; *In re Oliver, supra* (333 U. S. 257).

[61]*Voir dire* has been recommended by the Supreme Court on many occasions as an effective method by which prejudiced prospective jurors can be weeded out. See cases cited, *supra,* fn. 38. With all due defer-

pretrial stage of a criminal case poses an altogether different situation. The jury has yet to be selected, therefore it can neither be voir dired nor sequestered. Moreover, in Ohio, motions to suppress evidence must be made before trial.[62] In light of Crim. R. 12(J),[63] it would be totally im-

ence to that body, we are not so sure of the practical effectiveness of *voir dire* in a heavily publicized case. In order to determine exactly how much outside knowledge a particular prospective juror possesses concerning a certain pending action, it is often necessary for lawyers to ask probing questions which, necessarily, may include as a part thereof prejudicial information. In this regard we are reminded of a statement Mr. Justice Frankfurter once quoted: "[I]t hardly seems necessary for the court to say to men who are experienced in the trial of jury cases, that every time defense counsel asked a prospective juror whether he had heard a radio broadcast to the effect that his client has confessed to this crime or that he has been guilty of similar crimes, he would by that act be driving just one more nail into * * * [the defendant's] coffin. We think therefore, that remedy was useless." *Maryland* v. *Baltimore Radio Show, Inc., supra* (338 U. S. 912, 916). (Frankfurter, J., opinion respecting the denial of certiorari.)

Although we recognize the general usefulness of *voir dire*, we are not prepared to say that the subliminal effect of knowledge received through non-court sources does not play any part in a juror's deliberation and decision in a case.

[62]Crim. R. 12 provides, in pertinent part:

"(B) Any defense, objection or request which is capable of determination without the trial of the general issue may be raised before trial by motion. The following must be raised before trial:

"* * *

"(3) Motions to suppress evidence, including but not limited to statements and identification testimony, on the ground that it was illegally obtained;

"* * *

"(G) Failure by the defendant to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court pursuant to subdivision (C), or prior to any extension thereof made by the court, shall constitute waiver thereof, but the court for good cause shown may grant relief from the waiver."

[63]Crim. R. 12(J) provides in pertinent part:

"The state may take an appeal as of right from the granting * * * of a motion to suppress evidence if, in addition to filing a notice of appeal, the prosecuting attorney certifies that: (1) the appeal is not taken for the purpose of delay; and (2) the granting of the motion has rendered the state's proof with respect to the pending charge so weak in its entirety that any reasonable possibility of effective prosecution has been destroyed."

practical to empanel and sequester a jury prior to adjudication of a pretrial motion to suppress evidence.

R. C. 2945.31 also buttresses this conclusion. It clearly states that sequestration of jurors may be ordered by the court "[a]*fter* the trial has commenced * * *." (Emphasis added.) In equally clear language, Crim. R. 12(E) requires that "[a] motion made before trial [*i. e.* a motion to suppress made pursuant to Crim. R. 12(B)] other than a motion for change of venue, *shall be timely determined before* trial." (Emphasis added.) In light of R. C. 2945.31 and Crim. R. 12(E), then, sequestration of the jury is unavailable as an alternative to respondent's order under the circumstances of this case.

With respect to change of venue as a possible alternative, we reiterate that each defendant possesses a constitutional right to be tried in the "district wherein the crime shall have been committed."[64] Both the federal and Ohio Constitutions provide as much in explicit language, although in different terms. Unfortunately, there is very little authority explaining the nature and scope of the right.[65] We need not explicate our views upon the subject, however, because that issue is not presently before us. For the purposes of the instant cause, it is sufficient to say that the defendant is guaranteed the right to be tried in the locale of the crime, whether the locale be termed the "district" or the "county." Any other interpretation of the aforesaid constitutional provisions would render meaningless the unequivocal language appearing therein.

---

[64]Sixth Amendment to the Constitution of the United States and Section 10, Article I of the Ohio Constitution. See fn. 13, *supra*, and Parts III and IV (B) of this opinion.

[65]*People* v. *Jones* (1973), 9 Cal. 3d 546, 510 P. 2d 705; *Alvarado* v. *State* (Alaska 1971), 486 P. 2d 891; and *Maryland* v. *Brown* (D. Md. 1969), 295 F. Supp. 63. See, also, *Williams* v. *Florida* (1970), 399 U. S. 78, 93-99; *United States* v. *Florence* (C. A. 4, 1972), 456 F. 2d 46 and *State* v. *Kappos* (Iowa, 1971), 189 N. W. 2d 563, certiorari denied, 405 U. S. 982 (1972). See, generally, Notes, *People* v. *Jones*—The Jury Must be Drawn From the District of the Crime. 25 Hastings L. J. 547 (1974).

Of course, a defendant may waive his constitutional right to be tried in the locale of the crime by the filing of a motion for a change of venue pursuant to Crim. R. 18.[66] Defendant Moore filed such a motion in the cause at bar.

We do not believe that the interests of justice countenance the waiver of one constitutional right in order to secure another. Waiver has been defined as "an intentional relinquishment or abandonment of a known right or privilege," *Johnson* v. *Zerbst* (1938), 304 U. S. 458, 464, and courts should "indulge every reasonable presumption against waiver." *Aetna Ins. Co.* v. *Kennedy* (1937), 301 U. S. 389, 393. See, also, *Barker* v. *Wingo, supra* (407 U. S. 514, 525). As the court in *Delaney* v. *United States* (C. A. 1, 1952), 199 F. 2d 107, at page 116, stated: "The right to apply for a change of venue is given for the defendant's benefit and at his option. He is not obliged to forego his constitutional right to an impartial trial in the district wherein the offense is alleged to have been committed * * *."

In Ohio, Crim. R. 18(B)(1) requires that a motion for a change of venue "be made within thirty-five days after arraignment or seven days before trial, whichever is earlier, or at such reasonable time later as the court may permit." Since claims of prejudicial pretrial publicity are generally rejected upon appeal absent a defense motion for a change of venue, see *Hickok* v. *Crouse* (C. A. 10, 1964), 334 F. 2d 95, certiorari denied, 379 U. S. 982; *United States* v. *Rosenberg* (C. A. 2, 1952), 200 F. 2d 666, certiorari denied, 345 U. S. 965 (1953); *United States, ex rel. Darcy,* v. *Handy* (1956), 351 U. S. 454; *Stroble* v. *California* (1952), 343 U. S. 181, and since Crim. R. 18(B)(1)

---

[66]Crim. R. 18 provides, in pertinent part:

"(B) Upon the motion of any party or upon its own motion the court may transfer an action to any court having jurisdiction of the subject matter outside the county in which trial would otherwise be held, when it appears that a fair and impartial trial cannot be held in the court in which the action is pending."

Defendant Moore filed a motion for change of venue pursuant to this rule, which motion has yet to be ruled upon.

sets forth a limited period of time in which such motions may be made in Ohio, it was incumbent upon this defendant to file a motion for a change of venue in order to protect his rights upon appeal, if convicted. As such, upon the record before us, we are in no position to discern whether defendant Moore voluntarily, intelligently and knowingly chose to *waive* his constitutional right to be tried in the locale of the crime.[67]

Moreover, in light of the world-wide wave of instances of kidnapping for ransom in recent years, we are unconvinced that a change of venue in this case will accomplish its intended objective. It is arguable, at least, that Moore's trial will create news wherever it is held.

Perhaps equally important to consider in connection with a court order transferring the venue of this trial is the effect such order would have upon the Dayton community itself. Transfer of a case such as this one amounts to a virtual confession that the citizens of Dayton would be unable to afford this defendant a fair trial. The fairness and objectivity of the citizens of Dayton is thus also at stake here.

In addition, the Dayton community would be virtually denied the opportunity to observe its legal system in action during the actual trial of this case. After all, the citizens of Dayton are vitally concerned with the effectiveness of its criminal justice system in ferreting out and convicting persons found guilty of criminal conduct, as well as in protecting the constitutional rights of each defendant as he or she is processed through the system of justice.[68]

---

[67]O'Neill, C. J., in his opinion, states unequivocably that defendant Moore has "waived his right to be tried in the locale where the crime occurred by his motion for a change of venue." Stern, J., also adheres to this view. For the reasons set forth in the body of this opinion, we cannot ascribe to that view upon the meager record presented herein with regard to this particular issue.

[68]It is anomalous indeed that the opposing viewpoint adopted in this case concludes that the writ of prohibition should be allowed primarily because the alternative "solution" of a change of venue is available. O'Neill, C. J., maintains that the right of the press to gather news

Finally, a change of venue presents numerous costly practical problems such as transportation of witnesses to and from the trial, and transportation of jurors to view the situs of the crime.

Based upon the above reasons, we conclude that the alternative remedy suggested by relator of a change of venue would be unwise and premature at this time[69] *as there*

must be preserved so that the public will be apprised of proceedings of news interest involving the administration of criminal justice. But a change of venue in this case will operate to deprive the citizens of Dayton of an opportunity to participate in the criminal justice system existing in that community, as well as to arguably reduce the incentive for the Dayton newspapers to continue devoting substantial news space to the trial of defendant Moore.

On the other hand, holding the pretrial suppression hearings *in camera* may obviate a subsequent need to resort to a change of venue in order to avoid an impermissible derogation of the defendant's constitutional rights, while, at the same time, will preserve the ability of the citizens of Dayton to scrutinize the administration of criminal justice as defendant Moore is processed through that system, as well as provide the opportunity for certain of its citizens to serve as jurors in the event the case is brought to trial. Holding the pretrial suppression hearings *in camera* will delay dissemination of the information disclosed therein, but will not otherwise denigrate the public interest in the case or intrude upon the freedom of the press to publish such information as it possesses.

[69]O'Neill, C. J., relies heavily upon *Sheppard* v. *Maxwell, supra* (384 U. S. 333), *Irvin* v. *Dowd, supra* (366 U. S. 717), and *Murphy* v. *Florida, supra* (44 L. Ed. 2d 589) in support of his position that a change of venue must be granted prior to utilization of any procedure that in any way hampers the press in its exercise of its First Amendment freedoms. As demonstrated in fn. 41, *supra*, the precise legal issue involved in the instant cause was not before the Supreme Court of the United States in the aforesaid cases upon which O'Neill, C. J., relies.

Moreover, Mr. Justice Blackmun, in his capacity as Circuit Justice, stated the following in *Nebraska Press Assn.* v. *Stuart,* —— U. S. ——, 46 L. Ed. 2d 237, 242:

"At the same time I cannot, and do not, at least on an application for a stay and at this distance, impose a prohibition upon the Nebraska courts from placing any restrictions at all upon what the media may report prior to trial. Restraints of this kind are not necessarily and in all cases invalid. See, *Branzburg* v. *Hayes,* 408 U. S. 665, 685

*has yet to be a finding that a fair and impartial trial cannot be had for defendant Moore in Dayton.*

(1972); *Times-Picayune Pub. Corp.* v . *Schulingkamp*, 419 U. S. at 1307; *Newspapers, Inc.*, v. *Blackwell*, 421 U. S. 997 (1975). *I am particularly conscious of the fact that the District Court's order applies only to the period prior to the impaneling, and presumably the sequestration, of a jury at the forthcoming trial. Most of our cases protecting the press from restrictions on what they may report concern the trial phase of the criminal prosecution, a time when the jurors and witnesses can be otherwise shielded from prejudicial publicity, and also a time when both sides are being heard.* See, *e. g., Craig* v. *Harney*, 331 U. S. 367 (1947); *Pennekamp* v. *Florida*, 328 U. S. 331 (1946); *Bridges* v. *California*, 314 U. S. 252 (1941). Restrictions limited to pretrial publicity may delay media coverage—and, as I have said, delay itself may be impermissible—but at least they do no more than that.

"I therefore conclude that certain facts that strongly implicate an accused may be restrained from publication by the media prior to his trial. A confession or statement against interest is the paradigm. See, *Rideau* v. *Louisiana*, 373 U. S. 723 (1963); *Irvin* v. *Dowd*, 366 U. S. 717 (1961). A prospective juror who has read or heard of the confession or statement repeatedly in the news may well be unable to form an independent judgment as to guilt or innocence from the evidence adduced at trial. In the present case, there may be other facts that are strongly implicative of the accused, as, for example, those associated with the circumstances of his arrest. There also may be facts that are not necessarily implicative, but that are highly prejudicial, as, for example, facts associated with the accused's criminal record, if he has one. Certain statements as to the accused's guilt by those associated with the prosecution might also be prejudicial. *There is no litmus paper test available. Yet some accommodation of the conflicting interests must be reached.*" (Emphasis added.)

It must be remembered that the issue in *Nebraska Press Assn.* v. *Stuart* is the constitutionality of a "gag order," a traditional prior restraint. Yet the above statements made by Mr. Justice Blackmun reveal that (1) there is a significant difference between trial and pretrial proceedings; (2) prior restraints are not, in all instances, constitutionally invalid; (3) no litmus paper test is available to accommodate the conflicting First and Sixth Amendment rights involved in the circumstances surrounding a heavily publicized criminal case; but (4) some *accommodation* must be reached.

An accommodation can be reached in the cause at bar, a non-prior restraint case. Mr. Justice Blackmun's circuit opinion, in *Nebraska Press Assn.* v. *Stuart*, does not support the position taken by O'Neill, C. J., in this case.

Accordingly, since we believe that under the facts of this case, a serious and imminent threat to defendant Moore's constitutional right to a fair trial before an impartial tribunal has been shown to exist, the question remains whether such governmental and individual fair trial interest outweighs the First Amendment right of access to news asserted by relator.

Relator contends that the effect of respondent's order is to abrogate its constitutional right of access to newsworthy information and, as a consequence thereof, to prevent public receipt of such information. Relator relies primarily upon *Cox Broadcasting Corp.* v. *Cohn, supra* (420 U. S. 469, 43 L. Ed. 2d 328), *Branzburg* v. *Hayes, supra* (408 U. S. 665), and *Shelton* v. *Tucker* (1960), 364 U. S. 479, in support of its position.

Decisions of the Supreme Court recognizing the special position occupied by the media in our democratic society by virtue of the First Amendment guarantees are legion.[70] Since we have already examined the role the media plays in our society in somewhat greater detail in Part IV(A) of this opinion, we only reiterate our general agreement with the authorities reviewed therein.

We recognize that "the First and Fourteenth Amendments also protect the right of the public to receive such information and ideas as are published," *Pell* v. *Procunier*

---

Finally, our opinion does *not* dictate that a change of venue *is unavailable at all* under the circumstances of this cause, only that it has not yet been shown to be necessary to resort to that procedure in order to ensure defendant Moore a fair trial. *Sheppard* v. *Maxwell, supra, Irvin* v. *Dowd, supra,* and *Murphy* v. *Florida, supra,* relied upon by O'Neill, C. J., are thus not relevant *at this time.* Of course, the trial judge may yet order the venue of this trial changed, if he determines that a fair trial cannot be secured to defendant Moore in Dayton.

[70]See, *e. g., Cox Broadcasting Corp.* v. *Cohn, supra* (420 U. S. 469); *Miami Herald Publishing Co.* v. *Tornillo, supra* (418 U. S. 241); *Gertz* v. *Robert Welsh, Inc., supra* (418 U. S. 323); *Branzburg* v. *Hayes, supra* (408 U. S. 665); *New York Times Co.* v. *United States, supra* (403 U. S. 713); *Time, Inc.,* v. *Hill, supra* (385 U. S. 374); *Sheppard* v. *Maxwell, supra* (384 U. S. 333).

532

(1974), 417 U. S. 817, 832, citing *Kleindienst* v. *Mandel* (1972), 408 U. S. 753, 762, and *Stanley* v. *Georgia* (1969), 394 U. S. 557, 564. But that is not the ultimate question presented herein.[n] Rather, the specific First Amendment issue before us is whether the media has an *absolute* right to gather information for the purpose of publication.

In *Branzburg* v. *Hayes, supra,* cited by relator, the Supreme Court held that the First Amendment was not violated by a requirement that reporters disclose the identity of their confidential sources to a grand jury, at least when such information was essential to the undertaking of a good-faith criminal investigation. Although the *Branzburg* court noted that "news gathering is not without its First Amendment protections," 408 U. S. at 707, for "without some protection for seeking out the news, freedom of the press could be eviscerated," *id.*, at 681, it clearly summarized its position on the question of the media's asserted constitutional right of access to newsworthy information when it stated:

"It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally. * * *

"Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, our own conferences, the meeting of other official bodies gathering in executive session, and the meetings of private organizations. Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded, and *they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal.*" 408 U. S. at 684. (Emphasis added.)

---

[n] Since in Part IV (D) of this opinion we feel that a transcript of all closed proceedings should be kept, and made available to the press and public as soon as practicable under the circumstances of each case, the public's right to receive information, although delayed, is vouchsafed.

We interpret *Branzburg* as acknowledging both that the right of the media to gather information reaches constitutional dimensions under the First Amendment, and that such right is by no means absolute.[72] Accordingly, we do not perceive *Branzburg* as controlling upon us in the manner suggested by relator.

Likewise, *Cox Broadcasting Corp.* v. *Cohn, supra*, fails to aid relator's position. *Cohn* involved an action for invasion of privacy filed against a television station for publishing the name of a rape victim in violation of a Georgia statute. In *Cohn*, the Supreme Court held that "[o]nce true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it." 43 L. Ed. 2d at 350. Moreover, the court in *Cohn* hinted that if other interests need protection in a judicial proceeding, then the states may take means by which public documentation or other exposure of damaging information may be avoided.

The limited import of the *Cohn* decision is clear: If information is public, its publication generally may not be restrained. We fail to see how that decision can support relator's position in the instant cause, especially in light of the suggestion offered in the majority opinion written by Mr. Justice White, which essentially reiterated the views he expressed in the plurality opinion he authored in *Branzburg*, to the effect that public access to the courts may be restricted, in appropriate circumstances, in order to assure a defendant a fair trial before an impartial tribunal.

Although we interpret *Cohn* and *Branzburg* as providing more support for respondent than for relator, we consider the recent trilogy of decisions concerning prisoner's rights and prison administration more closely an-

---

[72]We agree with the observation of O'Neill, C. J., that *Branzburg* recognizes the existence of the right of the press to gather news as a part of the freedom afforded the press by the First Amendment. We part company with him, however, when he suggests that *Branzburg* raises the right of the press to gather news to a state of preferred protection irrespective of other fundamental constitutional rights that may be damaged thereby.

534

alogous to the instant cause than either *Branzburg* or *Cohn.* We refer to *Saxbe* v. *Washington Post Co., supra* (417 U. S. 843); *Pell* v. *Procunier, supra* (417 U. S. 817); and *Procunier* v. *Martinez* (1974), 416 U. S. 396.

In *Pell* and *Saxbe*, the Supreme Court rejected a First Amendment challenge to prison regulations restricting inmate-press face-to-face interviews. In each case the regulations were challenged as restricting the right of media representatives "to gather news without government interference, which the media plaintiffs assert includes a right of access to the sources of what is regarded as newsworthy information." *Pell, supra*, 417 U. S. at 829; *Saxbe, supra*, 417 U. S. at 844. In rejecting this challenge, the *Pell* court held:

"The First and Fourteenth Amendments bar government from interfering in any way with a free press. The Constitution does not, however, require government to accord the press special access to information not shared by members of the public generally. It is one thing to say that a journalist is free to seek out sources of information not available to members of the general public, that he is entitled to some constitutional protection of such sources, cf. *Branzburg* v. *Hayes, supra*, and that government cannot restrain the publication of news emanating from such sources. Cf. *New York Times Co. v. United States, supra.* It is quite another thing to suggest that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally. That proposition finds no support in the words of the Constitution or in any decision of this Court." 417 U. S. at 834. Parts of the above quotation appear in *Saxbe* as the rationale for the decision. *Saxbe, supra*, 417 U. S. at 850.

We construe the decisions in *Pell* and *Saxbe* as reaffirming the principle alluded to in *Branzburg* that, in essence, although news gathering is a right of First Amendment dimension, such right is not in all instances absolute.[73]

---

[73]O'Neill, C. J., does not discuss the relevance of *Pell* and *Saxbe* to the cause at bar. In this regard, he misses the mark completely.

In *Procunier* v. *Martinez, supra*, the Supreme Court affirmed a district court judgment invalidating certain prison regulations authorizing censorship of prisoner mail. In that case, the Supreme Court held, at page 413, that "censorship of prisoner mail is justified if * * * First, the regulation or practice in question * * * [furthers] an important or substantial governmental interest unrelated to the suppression of expression * * * [and] Second, the limitation of First Amendment freedoms * * * [is] no greater than is necessary or essential to the protection of the particular governmental interest involved." The court viewed the governmental interests involved in *Martinez* (prison security, order and rehabilitation) as insufficient to justify the substantial restrictions imposed upon written communications by inmates and, accordingly, struck down those regulations as abridging First Amendment freedoms.

What is clear from the *Pell, Saxbe* and *Martinez* decisions is that the Supreme Court will utilize a balancing test whenever First Amendment rights are involved in a non-prior restraint context. In the "prison" cases discussed above, the various First Amendment rights were balanced against the governmental interests of prison security, order and rehabilitation.

In the instant cause we are called upon to balance relator's First Amendment right to gather newsworthy information at a pretrial hearing on a motion to suppress evidence against the governmental interest of protecting the administration of criminal justice and thereby securing to each accused in this state a fair trial before an impartial tribunal.

Upon balancing the substantial constitutional rights" involved herein, we conclude that the order of the trial

---

The primary issue in both *Pell* and *Saxbe* concerned the right of the press to gather news. That is exactly what is at issue in this cause; and no more than that. *Pell* and *Saxbe* are more than merely "relevant" to the disposition of this cause, those decisions are crucial to the proper formulation of the issue presented herein for decision, and aid immensely in the determination of the issue as so framed.

"These rights have been discussed at great length in Parts IV(A) and (B) of this opinion and need no further elucidation.

536

court should be sustained. Our conclusion is based upon the following factors: First, as previously illustrated, the publicity in the Dayton area has been intense, and has already included much potentially prejudicial information; second, closure of the courtroom for the limited period of time required to conduct the hearings on the defense motions to suppress evidence will serve only to delay public dissemination of the facts adduced at such hearings; third, the trial of defendant Moore will take place within a very short period of time following conclusion of the suppression hearings; fourth, at issue in the suppression hearings apparently is the admissibility, among other things, of a confession—publication of such matter immediately prior to trial cannot help but further inflame the potentially prejudicial atmosphere of the Dayton community, and render selection of an impartial jury there extremely difficult, if not impossible.

In our opinion, the foregoing conclusion is necessary to protect the constitutional right of defendant Moore to a fair trial before an impartial tribunal. This is not to say that such a result would necessarily ensue in all heavily publicized cases.[35] The trial courts of this state, pursuant to this opinion, are vested with the discretion to order a pretrial hearing held *in camera*. Hopefully, the plethora of reasons necessitating this result will not be duplicated in many future cases. Certainly, if law enforcement officials, court personnel, attorneys, and members of the press perform their respective duties responsibly, with awareness of the potential prejudicial effect release of such information as disclosed by the record in this cause may have upon a defendant's right to receive a fair trial, an accommodation may be reached which will protect the constitutional rights of all parties concerned. Such an accommodation would obviate the need for resort to *in camera*

---

[35] We, therefore, disagree with Stern, J., in this regard. We refer to the foregoing summary of the reasons for our disagreement.

proceedings in order to ensure that the defendant's constitutional rights are not impermissibly compromised.

## IV(D). *DUE PROCESS*

We comment briefly upon the procedure to be applied in the trial courts of this state when faced with a motion such as the instant one only because no such procedure exists by statute or by rule.[76] While we do not intend to espouse a hard and fast rule in this case, we do feel that certain observations are in order.

First, we note our approval of the manner in which Judge Phillips handled the instant motion in the court below. By affording relator the rudimentary elements of due process, Judge Phillips exhibited his awareness and appreciation of the important constitutional rights involved herein.

While we do not attempt to indicate that the procedure[77] utilized by Judge Phillips presents the only way to handle such a motion, we do conclude that due process requires notice of hearing and an opportunity to be heard prior to issuance of any such order of exclusion.

Secondly, in order to assure a thorough and expedient review upon appeal, the trial court should state separately its findings of fact and conclusions of law based upon the analysis set forth previously herein in Part IV(C) of this opinion.

Finally, in any case in which a part of the pretrial or

---

[76] Cf. fns. 8 and 9, *supra*. In addition, in the following states voluntary bench-bar press agreements have been adopted and are in effect:

Arizona (1968), California (1970), Colorado (1969), Idaho (1969), Kentucky (1970), Massachusetts (1963), Minnesota (1968), Missouri, (1968), Nebraska (1970), New Jersey (1972), New Mexico (1969), New York (1969), North Carolina (1966), North Dakota (1971), Oklahoma (1968), Oregon (1962), Pennsylvania (1971), South Dakota (1971), Texas (1969), Utah (1969), Virginia (1971), Washington (1966), and Wisconsin (1970). See, also, "Landau," *supra*, fn. 46.

[77] He invited others to present their position as amicus curiae. As such they filed briefs and presented oral argument at the hearing upon the defense motion to exclude the public and the press from defendant Moore's pretrial suppression hearings.

538

trial process is conducted *in camera*, a transcript must be kept and made available to the public and the press at the earliest nonprejudicial moment.[78]

It is our conclusion that only by adherence to the letter of the test elucidated previously herein in Part IV(C) of this opinion in the "due process" manner outlined directly above will the First Amendment rights of the media in this state be secured against indiscriminate and unnecessary employment by our trial courts of the power to close the courtroom to the public and the press. We strongly reiterate that nothing contained within the foregoing opinion countenances such a result, although, under the precise factual situation presented herein for review, we must conclude that the order of the respondent should be affirmed, and a writ of prohibition should be denied.[79]

---

[78]By adopting the above due process procedure to be applied along with the strict test for closure enunciated herein, the rights of the media would be afforded the maximum possible protection consistent with the constitutional guarantee of a fair trial.

In our opinion the rule of law expressed herein strengthens the procedural rights of the press in a manner not provided in other jurisdictions. See "Landau," fn. 46, *supra*.

[79]With respect to the contention of Stern, J., that "the test set out * * * fails * * * because it provides little enlightenment as to what course the trial judge should follow in assuring a fair trial of a highly publicized prosecution." We respond that a trial judge should utilize all the procedures available to him by law, including the option provided by this opinion, if essential to ensure a defendant a fair trial and due process of law. There is really no easy answer. Future cases should be decided on an *ad hoc* determination of the factual circumstances involved in each such case.